# Richmond

MATTHEW JORDAN, SR. v. COMMONWEALTH OF VIRGINIA.

March 5, 1976.

Record No. 750628.

Present, All the Justices.

*Glenn B. McClanan,* for plaintiff in error.

*Jerry P. Slonaker, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the court.

In this criminal appeal, we review the second degree murder conviction of Matthew Jordan, Sr., for the shotgun killing of Rufus Leon "Baby" Brock. The shooting occurred on Saturday, August 3, 1974, about 9:30 a.m. at the defendant's home in Virginia Beach. Jordan admitted killing Brock but claimed the shooting was in self-defense and accidental.

The defendant, who was sentenced to 12 years in the penitentiary in accordance with the jury's verdict, claims the trial court erred: in

admitting evidence of a prior crime; in failing to instruct the jury to disregard certain of his statements made to a police officer before he was advised of his rights, as required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966); and, in excluding evidence intended to establish the victim's propensity for violent conduct. The defendant also claims the evidence was insufficient to convict. We find no error and affirm.

The evidence viewed in the light most favorable to the Commonwealth shows that "just about dark" during the evening before the shooting, the defendant, Brock, and others were gambling and drinking heavily at the defendant's home. Later that evening, about 10:00 p.m., everyone left the home except the defendant, Brock, Jeremiah Williams, and Queenie Perkins, who "lived with" the defendant. Thereafter, the defendant went into the kitchen, came out with a knife, and while sitting on a couch next to Perkins, cut her across the knee with the knife for no apparent reason. Brock then asked the defendant why he had cut Perkins' knee and the defendant replied it was "none of his business." When the defendant refused to carry Perkins to a hospital for medical attention, Brock drove her there, where five "stitches" were required to close the wound. Brock and Perkins returned to the defendant's home early the next morning.

Later, about 8:30 a.m., after "the liquor run out", the defendant, Brock, Perkins and Williams left Jordan's house in the defendant's automobile. After driving for some time, Brock asked Jordan if he could drive, at which time Perkins said to Jordan, "Why don't you let Baby drive because you half drunk and you ain't got no driver's license. You driving all crazy down the road." The defendant then stopped the car, all four occupants exited and the defendant began chasing Perkins around the car. Brock again interceded and said, "Why don't you leave her alone. . . . You already cut her." Jordan replied, "You shut your mouth. You don't have nothing to do with it." Jordan then hit Brock and the two engaged in a "tussle." The defendant then got in his car and drove off. The others got a ride back to defendant's house with one of Jordan's co-workers. According to Perkins and Williams, when they arrived at the house the defendant was sitting in his car with a shotgun. Brock got out of the car and walked around to the back of the house. Jordan followed him and said, "Baby, . . . I going to shoot all you son of bitches because you tried to take my old lady away from me." Jordan then shot Brock. Perkins testified that Jordan "put another shell in the gun and . . . shot it at him again" and that Brock then fell over "backwards" in a

pea field. Williams, who was running through the garden and was a couple of hundred yards away at the time of the shooting, testified that he heard two shots.

Jordan then gave the gun to Perkins and ordered her to carry it into the house. After she placed it "in the bedroom", the defendant "called" her to the back door and said "Look what I did." She saw, for the first time, a knife in Brock's hand. The inference from her testimony is that the defendant placed the knife in Brock's hand after the shooting. Jordan then told Perkins that he did not intend to kill Brock, but meant only to shoot over his head to "scare him." The defendant then drove to a neighbor's house and asked her to call the police.

At trial, the defendant testified that when he returned home, after letting Perkins, Brock and Williams out of the car, Brock was waiting for him; that Brock ran inside, came out with a knife and started chasing him around the car; that he (Jordan) ran into the house, got the shotgun to protect himself and when he put a shell in the gun it accidentally fired, killing Brock.

The defendant's first contention is that the trial court erred in allowing Perkins to testify that he cut her knee on the night before the shooting. He argues that admitting evidence of an incident which occurred hours before the shooting and "had nothing to do" with it violated the rule that evidence of other crimes is irrelevant and inadmissible.

In general, "evidence which tends to show that an accused has committed another crime independent of, and unconnected with, that for which he is on trial is inadmissible. This is upon the principle that such evidence confuses the issue before the jury, unfairly surprises the accused with a charge he is not prepared to meet, and tends to prejudice him in the minds of the jury by showing his depravity or criminal propensity." *Fleenor* v. *Commonwealth*, 200 Va. 270, 274-75, 105 S.E.2d 160, 163 (1958). But there are well-established exceptions to the general rule. "Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, [or] if it establishes their prior relations . . . . Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial." *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

We think the challenged testimony of Perkins falls within the fore-

going exceptions, and was admissible. That evidence showed the first instance of any ill will or adverse feeling on the part of the defendant toward Brock. Brock interjected himself into a quarrel between the defendant and Perkins, and thereafter the relations between the defendant and Brock deteriorated to the point where they engaged in a roadside fistfight when Brock again attempted to protect Perkins. The animus was also revealed when the defendant said, just before the killing, "Baby, . . . I going to shoot all you son of bitches because you tried to take my old lady away from me." Furthermore, the cutting incident was part of a continuous event which was connected with and led up to the shooting.

■ The defendant next claims the trial court erred in failing to instruct the jury not to consider the testimony of a police officer about statements the defendant made before being advised of his *Miranda* rights. Officer W. E. Bailey was the first policeman to arrive on the scene after the shooting, followed immediately by Officer Robert Denny. The shooting had been reported to the officers as an accidental injury. When Bailey stopped in the driveway, Jordan walked toward him from the house and Bailey asked "what had happened." Jordan replied that he had "shot someone" and that the victim was "around back." The officers then went to the rear of the house and attempted to revive Brock by mouth-to-mouth resuscitation. The defendant attempted to help but, because he was "getting in our way", the officers told Jordan to "move back", whereupon the defendant went into the house.

Officer Denny, during cross-examination, described the revival efforts, and the events immediately following:

"I saw Mr. Jordan, he was standing at the back door in the doorway itself and I asked him who shot him. He indicated he did and I asked him approximately what time he was shot and he said at about 9:30. After we got negative results onto the first-aid, I went into the house and asked Mr. Jordan where was the gun at. He indicated it was in the front bedroom closet. He immediately carried me into the bedroom and showed me the gun and it was not touched by either one of us at that time. The gun was left there and we went into the living room. He asked me how the subject was getting along and I told him not very well. He then said, 'If he's dead, I killed him because I shot him.' "

Twelve minutes passed after the officers arrived and before Denny went into the defendant's house. Later, Denny took the defendant to

police headquarters, upon orders from a detective who had arrived on the scene, where Jordan was advised of his *Miranda* rights.

The defendant argues that, after his statements to Bailey, "the process shifted from investigatory to accusatory" and had "focused" on him. He contends that he would not have been allowed to leave the premises and that he had been deprived of his freedom in a significant way. He concludes that he should have been advised of his *Miranda* rights, and because he was not the jury should have been instructed to exclude from their consideration statements he made to Denny. We disagree.

The warnings required by *Miranda* must be given when a suspect is subjected to "custodial interrogation." 384 U.S. at 444. The Supreme Court explained that, "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*[1] The Court also said that, "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Id.* at 477. The mere presence of an officer and the mere fact of an investigation does not invoke *Miranda*.

In this case, the call received by the police officers described the shooting as accidental. When they arrived on the scene, their attention was focused on revival of the victim and not on interrogating Jordan. In fact, at that time they did not have reasonable cause to believe that a crime had been committed, or that the defendant had committed a crime. The defendant was not deprived of his freedom in any way. Rather, Jordan was asked to move away so they could attend to Brock. After resuscitation failed, Denny asked Jordan three questions in an effort to find out more of the circumstances of the shooting. Denny was not attempting to elicit a confession from the defendant and the questions were not asked in a coercive environment. The questions were of a fact-finding nature and were asked for the purpose of determining whether a crime had been committed and, if so, by whom. *See United States* v. *Gibson,* 392 F.2d 373 (4th Cir.

[1]The tests that the defendant cites, i.e., whether the process had shifted from investigatory to accusatory or whether the process had focused on the accused, were tests presented in *Escobedo* v. *Illinois,* 378 U.S. 478 (1964), which was decided prior to *Miranda* and which dealt with the sixth amendment right to counsel. The weight of authority is that those tests are not dispositive of the question of when the *Miranda* rights are required. Under *Miranda* the key test is whether the subject is "in custody." *See United States* v. *Hall,* 421 F.2d 540, 543 (2d Cir. 1969), cert. denied, 397 U.S. 990 (1970).

1968); *State* v. *Meadows*, 272 N.C. 327, 158 S.E.2d 638 (1968). Accordingly, since the questions asked by Denny were part of a general on-the-scene investigation and were not put during a custodial interrogation, the responses were properly admitted into evidence.

The defendant also contends that the trial court improperly refused to allow Ronald L. Murphy to testify that he had been stabbed by Brock during a fight which took place three to four months before the shooting. The proffered testimony was that Murphy had been in a restaurant in Virginia Beach when Brock and Murphy's brother began to fight. A number of others joined the fight and Murphy intervened, trying to stop it. He felt a sharp pain in his shoulder and later discovered that he had been stabbed. Murphy testified that he did not see who had stabbed him and that he had not seen Brock with a knife. Although he reported the incident to the police, he gave them a different account of the fracas.

The defendant argues that because he pled self-defense as the result of Brock's knife attack, the evidence was admissible to show Brock's propensity to act as he did at the time of the shooting in order to corroborate the defendant's testimony.

We follow the rule that an accused, producing evidence that he acted in self-defense, may show specific incidents of prior violent conduct on the part of the victim to establish the character of the victim for turbulence and violence for the purpose of corroborating his testimony, even though such trait is unknown to the accused. *Barnes* v. *Commonwealth*, 214 Va. 24, 25-26, 197 S.E.2d 189, 190 (1973). Moreover, if such evidence is remote, it is nonetheless admissible if a "nexus for relevancy of prior conduct or character has been established. . . ." 214 Va. at 26, 197 S.E.2d at 190-91. But this rule presupposes proof of the prior conduct. Here, the testimony was properly excluded because the prior conduct was not established. Murphy did not see Brock with a knife. He did not see Brock stab him. More importantly, the testimony did not reveal who was the aggressor in the fight. Murphy's testimony only showed that Brock had been involved in a fight, but failed to show that Brock had a violent character or that he had a propensity for making knife attacks.

Finally, we reject the defendant's contention that the evidence was insufficient to convict; it was abundant to support the jury's verdict.

For these reasons, we affirm the conviction.

*Affirmed.*