Curtis Jasper MOORE, Petitioner,

v.

Gerard BALLONE, Superintendent, et al., Respondents.

Civ. A. No. CA79-0548-R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 21, 1980.

Harvey Latney, Jr., Robert P. Geary, Richmond, Va., for petitioner.

Robert E. Bradenham, II, Asst. Atty. Gen. of Va., Richmond, Va., for respondents.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, an inmate confined at Central State Hospital in Petersburg, Virginia, having exhausted his state remedies, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges state convictions in the Circuit Court for the County of Greensville, Virginia, for rape and first degree murder, alleging that several self-incriminating statements were taken from him during a station-house interrogation and admitted into evidence at trial in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Respondent Ballone is Superintendent of the Central State Hospital, Petersburg, Virginia, a State institution for the treatment of the mentally ill where petitioner is presently confined. Respondent Mitchell is Warden of the Virginia State Penitentiary in whose custody the petitioner was placed by virtue of the judgment of conviction.

Jurisdiction is attained pursuant to 28 U.S.C. § 2241.

Petitioner has moved for summary judgment and respondents have filed their response thereto. Neither petitioner nor respondents seek a plenary hearing on the merits of the instant petition, choosing instead to rely on the state court records. Having heard oral argument on petitioner's motion for summary judgment and reviewing the state court records, the Court finds summary judgment inappropriate, due to the many factual disputes, but finds the petition itself ripe for disposition on its merits.

Certain of the facts surrounding petitioner's claim are not in dispute. On the night of January 2, 1975, Mrs. Eva Jones, age 88, was the victim of a brutal rape and murder in her home across from the Emporia, Virginia police station. Before her death that night she told police that a black man had entered her house and had forced himself upon her. An intense investigation ensued, with some fifteen to twenty possible suspects questioned during the following six days . On the afternoon of January 8, 1975, two Emporia police officers picked up petitioner and took him to the police station for questioning. Petitioner had been brought to the police's attention by reason of several complaints about his suspicious behavior in the Skippers area of Greensville County, and at a nearby Ramada Inn.

The County Sheriff was notified of petitioner's apprehension and met the two officers and petitioner at the stationhouse. The Sheriff found petitioner about 3:30 or 4:00 o'clock p. m. in a back room at the police station being questioned by the officers. He introduced himself to petitioner and began questioning him concerning the rape and murder of Mrs. Jones. A tape recorder was engaged at this point and remained in operation throughout the questioning of petitioner. One officer operated the tape recorder and two others assisted the Sheriff in the interrogation. The tape reflects that the petitioner found many of the questions incomprehensible, and he revealed to the officers that he had been hospitalized previously for mental disorders. Several inconsistent but incriminating

statements were made by petitioner throughout the afternoon and into · the night. At 8:30 or 9:00 o'clock p. m., the Sheriff concluded that a visit to the victim's home would trigger, if not a full confession, at least further inculpatory statements. The police escorted petitioner to the victim's home, where, as anticipated, he made further statements placing himself at the victim's home on the night of the murder. These statements were not recorded.

Following this initial visit to the victim's home, the police returned to the station with petitioner and called his parents to join them there. After a brief discussion at the station with the petitioner's mother and step-father, the police returned with them and the petitioner to the victim's home, where petitioner reiterated his actions and remarks. They all returned to the police station and later that night petitioner was committed to Central State Hospital in Petersburg, Virginia.

Several crucial facts are disputed by the parties. Respondents argue here, as did the prosecution at trial, that the police picked up petitioner for questioning concerning the complaints about his suspicious behavior in Skippers and at the Ramada Inn, unrelated to the rape and murder of Mrs. Jones. The Sheriff testified that he questioned petitioner for the same reasons and in the same manner that he had routinely questioned several others pursuant to the murder investigation. Petitioner argues, however, that he was picked up solely for the purpose of interrogation concerning the Jones murder, and that once the questioning began, he was not free to leave, but was instead held in police custody. Respondents assert that petitioner was not being held in any manner and was free to leave at any time prior to the initial visit to the victim's house.

Undoubtedly, the most crucial area of dispute concerns whether petitioner was informed of his rights under *Miranda* prior to making any incriminating statements. The Sheriff testified that at a point in the interrogation when petitioner appeared to place himself at the victim's house on the night of the murder, the Sheriff left the room in order to call the Commonwealth's Attorney for advice on the most appropriate procedure. Unable to locate the Commonwealth's Attorney, the Sheriff contacted the City Attorney, who allegedly recommended that petitioner be advised of his *Miranda* rights immediately. The Sheriff testified that he then returned to the interrogation room and read petitioner his *Miranda* rights from the card he carried for that purpose. The Sheriff insisted that he read petitioner his rights shortly, if not immediately, before the initial visit to the victim's home, in which event petitioner had been questioned for at least four hours prior thereto. None of this conversation appears on the tape of the interrogation.

Petitioner moved, prior to trial, to suppress his statements made at the time of the interrogation on the ground that he had not been properly and timely advised of his *Miranda* rights. After considering evidence at the suppression hearing on April 29, 1976, the trial court denied petitioner's motion. The Court based its ruling on the following findings of facts:

[T]he defendant was picked off the street in the investigation of some other matter involving Skippers and also the Ramada Inn. He was brought to the Emporia Police Department and during the course of that investigation the defendant was interrogated along the Jones' matter. The Sheriff learned that the defendant had seen a person bearing the description of the victim in the Jones case. At no time during that investigation had the defendant made any admissions affecting his guilt. During that investigation he was not in the custody of the police. He was with them, he could have walked out at any time that he wanted to. There was nothing to prevent him from doing it, the Sheriff said that he could leave any time. He didn't communicate that to the defendant. This was during the investigatory stage of the Jones' murder case, at a time when the Sheriff believed that this investigation might center upon this particular defendant that he would

probably have to accuse him, at that time he made the warning. The motion to suppress is overruled.

Petitioner's statements were admitted into evidence at trial over his continued objection and petitioner was convicted of rape and murder. The convictions were subsequently affirmed without opinion by the Virginia Supreme Court.

The instant petition raises the single issue of whether the prosecution bore its burden of proving the use of adequate procedural safeguards under *Miranda* prior to the admission of petitioner's inculpatory statements into evidence. For the reasons that follow, the Court finds that that burden was not met by the prosecution and that petitioner's convictions secured through the use of such statements must be vacated.

I.

■ As a threshold matter, the Court acknowledges that the question of whether the prosecution proved the voluntariness of petitioner's inculpatory statements under *Miranda* is a mixed one, involving both factual and legal determinations. Most of the relevant factual issues were resolved by the trial court at the April 29, 1976, suppression hearing. Consequently, such factual findings are to be presumed to be correct, on habeas corpus review, unless

> that part of the record of the State Court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and [this Court] on a consideration of such part of the record as a whole concludes that *such factual determination is not fairly supported by the record. . .*

28 U.S.C. 2254(d)(8) (emphasis added). *See Townsend v. Sain,* 372 U.S. 293, 316, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963). This statutory standard of "fairly supported" has been held to be the same as the "clearly erroneous" standard employed in federal appellate review of trial findings of constitutional facts. *Leavitt v. Howard,* 462 F.2d

992, 996 (1st Cir. 1972), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). In the event that the trial court applied improper constitutional standards or other principles of federal law to the historical facts, however, this Court may, and indeed, must, make its own determination of law.

■ The United States Supreme Court held in *Miranda* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* 384 U.S. at 444, 86 S.Ct. at 1612. The minimal procedural safeguards suggested by the Supreme Court are the now-familiar warnings, prior to any questioning, that the person has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. *Id.* To the end of ensuring the voluntariness of any self-incriminating statements offered into evidence, the burden is placed on the prosecution to prove by a preponderance of the evidence that, prior to any custodial interrogation, the defendant was fully apprised of his Fifth and Sixth Amendment rights under *Miranda. Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Ralph v. Warden,* 438 F.2d 786, 793 (4th Cir. 1970), *cert. denied* 408 U.S. 942, 92 S.Ct. 2846, 33 L.Ed.2d 766 (1972).

■ The prosecution bears the further burden of demonstrating that any inculpatory statements following the *Miranda* warnings were made after a knowing and intelligent waiver of his right to remain silent and his right to counsel. *Miranda, supra* 384 U.S. at 475, 86 S.Ct. at 1628. This burden was characterized as "a heavy burden", *Id.,* and courts are required to indulge in every reasonable presumption against waiver. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). These burdens are properly placed on the prosecution's shoulders "[s]ince the State is responsible for estab-

lishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation . . . ." *Miranda, supra* 384 U.S. at 475, 86 S.Ct. at 1628.

■ The evil sought to be remedied by *Miranda* and its progeny was the coercion inherent in custodial interrogations. Even in the absence of physical brutality, police may intimidate an individual through trickery, persuasion, and actual threats, into making statements against his interest, both true and untrue. Indeed, it is well known that police are advised to employ several methods of psychological coercion in order to elicit confessions from suspects. When used in the closed, unfamiliar, incommunicado and police-dominated atmosphere of most custodial interrogations, even the strongest-willed individual may be persuaded to relinquish his constitutional rights. *See Id.* at 448–58, 86 S.Ct. at 1614–19. For this reason, courts must ensure that the prosecution clearly show that any inculpatory statements offered into evidence against a defendant were voluntarily made after an intelligent and knowing waiver of the right to remain silent and the right to counsel.

## II.

The initial burden was on the State of proving by a preponderance of the evidence that petitioner was advised of his rights under *Miranda* prior to custodial interrogation. As noted above, proof that proper and timely warnings were given does not dispose of the voluntariness issue; *Miranda* merely prescribes minimal procedural safeguards to ensure voluntariness. At the suppression hearing, the prosecution presented evidence of the nature of petitioner's interrogation through the testimony of the Sheriff. The Sheriff testified that petitioner was "picked up" or "hauled in" for questioning on the afternoon of January 8, 1975, concerning complaints about his behavior in Skippers. Petitioner was interrogated in a rear room at the police station by three different police officers, including the Sheriff, while a fourth operated the tape recorder. Although the Sheriff insisted that petitioner had been free to leave the interrogation, he stated that no one conveyed that fact to petitioner. Indeed, the transcript of the interrogation reflects that petitioner indicated a desire to leave, only to be told in one instance, "You tell what happened. We're tired of messing around here now— we're ready to go home. Tell me what happened so you can go home too", and in another instance, "That's good, now, you're telling us how things happened. That's what I want so we can go home after a few minutes. I know you are ready to go home, aren't you?", followed immediately by further questions.

Finally, the Sheriff testified that he read petitioner his *Miranda* rights, after telephonically consulting with the City Attorney at a point when the investigation, as he put it, began to focus on petitioner.

As quoted above, the trial court found that petitioner was indeed picked up for questioning concerning the Skippers and Ramada Inn complaints, and that at some point in that investigation he was questioned about the Jones murder. The trial court found further that Sheriff Sasser informed petitioner of his *Miranda* rights at a time when he thought he might have to accuse petitioner. The court found that, prior to that point petitioner had been free to leave the interrogation at any time.

While the trial court's findings of fact are entitled to a presumption of correctness, this Court finds that the record does not "fairly support" such findings. 28 U.S.C. § 2254(d). The prosecution's evidence fell short of the preponderance standard required for a showing of compliance with *Miranda*. Although the only witness to testify at the suppression hearing stated that *Miranda* warnings were read to petitioner prior to the first visit to the victim's house, the record is devoid of any corroborative evidence that petitioner was so informed.

In fact, the record would suggest that petitioner was never informed of his *Miranda* rights. The Sheriff testified that the

warnings were given "an hour or so" into the interrogation, which began at 3:30 or 4:00 o'clock p. m., yet later he indicated that this did not occur until late that night before visiting the victim's house at 9:00 o'clock p. m. The *Miranda* warnings do not appear anywhere on the tape recording which, according to the Sheriff, contained his conversation with petitioner. No explanation was offered for this gap in the recording in spite of the existence of as many as three police officers present during the interrogation who might have corroborated the Sheriff's testimony. In addition, the prosecution failed to present corroborative testimony from the City Attorney to the effect that he was called by the Sheriff on the night of January 8, 1975, concerning the necessary *Miranda* procedure. Further, the taped interrogation commences with a direct reference by the Sheriff to the victim's pocketbook.

■ The Supreme Court in *Miranda* placed the burden of proving compliance with its procedural safeguards on the prosecution because only the state has available to it "corroborated evidence of warnings given during incommunicado interrogation." *Miranda, supra* at 475, 86 S.Ct. at 1628. To hold that the state has carried its burden by presenting the uncorroborated testimony of the interrogator, in light of contradictory evidence in the record, would seriously emasculate the *Miranda* doctrine and render the language of the Fifth Amendment hollow. In anticipation of the burden prosecutors bear with regard to a defendant's inculpatory statements, police generally record the reading of the *Miranda* warnings along with any confession that may follow, or secure a signed statement from a defendant that he has been advised of his rights. Although the absence of such a recording or writing is not fatal to the prosecution's case, it does make the burden of proving compliance with *Miranda* heavier. A simple statement by the Sheriff, after prodding by the prosecutor, that

warnings were read at some point in the interrogation is, in the Court's view, inadequate evidence with which to shoulder that burden.

■ Even assuming that the Sheriff read petitioner his *Miranda* rights just prior to visiting the victim's house, as he testified, the Court is of the view that such a reading would have been untimely and of no value in safeguarding petitioner's constitutional rights. *Miranda* requires that an individual be advised of his rights prior to "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. There is no doubt in the Court's mind that petitioner was interrogated while at the police station from 3:30 or 4:00 o'clock p. m. until 8:30 or 9:30 o'clock p. m. under any reasonable construction of the term "interrogation".[1] Therefore, the key to determining when the interrogation of petitioner triggered the application of *Miranda* rests with a decision as to when petitioner was in custody.

■ The trial court found that petitioner was informed of his rights at a point in the questioning when the investigation began to focus on petitioner, a point just prior to visiting the victim's home, according to the Sheriff. Although the trial court found as crucial to the custody determination the alleged shift in questioning from an investigative stage to an accusatory stage, such a test, in this Court's view, is not now, nor was it then, dispositive of a determination of custody.

The so-called "focus" test employed by the trial court defined custody as the point in an investigation when a general inquiry into an unsolved crime begins to focus on a particular suspect. *See Escobedo v. Illinois,* 378 U.S. 478, 490–91, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977 (1964). Use of this test for determining whether an interrogation is custodial was limited to a very few courts

---

1. The Court finds a reasonable definition of "interrogation" to be questioning by a law enforcement officer with the intention of soliciting a response concerning the subject's guilt or innocence in suspected criminal activity.

that this Court believes, misread a somewhat confusing footnote in *Miranda, supra.*[2] Prior to petitioner's suppression hearing, the Supreme Court rejected focus alone as dispositive of the custody question. *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1975). Instead, the Supreme Court reiterated that *Miranda* had broadened the scope of Fifth and Sixth Amendment protections to the point when an individual is taken into custody, not simply when an investigation focuses upon him. *Id. See, Jordan v. Commonwealth,* 216 Va. 768, 772, 222 S.E.2d 573, 577 (1976). As noted above, the rationale of *Miranda* was protection from the coercive conditions in in-custody interrogation, regardless of the information or suspicions held by the police. Focus is therefore only one element in determining whether petitioner was in custody at the Emporia police station.

■ Factors relevant to a custody determination include the nature of the interrogator, the nature and condition of the suspect, the time and length of the questioning, the nature of the questioning—accusatory or investigatory, the focus of the investigation at the time of questioning, and the place of the interrogation. No single factor is necessarily dispositive of the question of custody, although the United States Court of Appeals for the Fourth Circuit found the latter dispositive in *United States v. Gibson,* 392 F.2d 373 (4th Cir. 1968), holding that custodial interrogation "certainly includes all station-house or police-car questioning initiated by the police, for there the 'potentiality for compulsion' is obvious." *Id.* at 376. Certainly an interrogation at a police station is more likely to be custodial in nature, especially when it involves a person of obvious mental deficiencies.

After reviewing the state court records, including the tape recording of the police interrogation of petitioner, and the transcripts of the suppression hearing and of petitioner's trial, the Court finds that petitioner was in custody, and therefore entitled to *Miranda* warnings from the outset of his questioning at the police station. The factors relevant to this finding are numerous. The Sheriff testified that petitioner was "hauled in" for questioning other than for the Skippers and Ramada Inn incidents. Indeed, as the Court has already pointed out, the Sheriff's questions to petitioner commenced with and concerned only the Jones murder. The nature of the interrogation was clearly accusatory from the start. The intimidation inherent in being questioned by three different police officers simultaneously also may not be overlooked. Petitioner was obviously "acting strange" according to the Sheriff, who at one point shouted in frustration "You're not half as damn nuts as you act like you are, you know that?" Further, the Sheriff admitted that he knew of petitioner's prior hospitalization for mental disorders. The questioning of petitioner prior to the purported *Miranda* warnings encompassed a period of at least five hours, during which time petitioner was kept incommunicado.

Although the trial court found that petitioner was free to leave at any time during the interrogation, the tape recording of the interrogation itself does not support such a finding. Frequently petitioner stated that he was tired, wanted to go home, and asked how much longer he had to stay in the interrogation room. In response, the Sheriff and his fellow officers would either not answer petitioner or assure him that he could leave only after he told them about his actions on the night of the Jones murder.[3] Petitioner was repeatedly ordered to

**2.** The Supreme Court, in *Miranda,* explained in a footnote following its definition of "custodial interrogation":

> 4 This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

**3.** The transcript of the interrogation reads, in relevant part:

> *Moore:* Where's my mother, when she's going to pick me up?
> *Police:* She, well it will take a few minutes to get here, you know that's at Skippers.
> *Moore:* It's only six miles away.
> *Police:* Right, that's at Skippers you know. [questioning resumed]
>
> .     .     .     .     .
>
> *Moore:* How many more questions?

look at the interrogating officer when he was answering a question. When petitioner requested that he be allowed to call his mother, the Sheriff replied that he would do so instead and that petitioner should remain in the room. The Sheriff's failure to inform petitioner that he was free to leave at any time is entirely consistent with this Court's finding that he was unquestionably not free to leave. The Court finds further that any reasonable man would not have felt free to leave under these conditions, much less an obviously disoriented individual known by the police to have a history of mental problems. The Court thus finds the trial court's determination of the point of custody clearly erroneous.

Contrary to the argument of respondents, the Court finds *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), inapposite to petitioner's case. In *Mathiason*, the Supreme Court found *Miranda* inapplicable to the station-house questioning of a burglary suspect. Although the Supreme Court found that the questioning took place in a "coercive environment", no

> *Police*: Ah, we'll talk a few more minutes.
> *Moore*: No, I tired now.
> *Police*: Huh?
> *Moore*: I'm tired now.
> *Police*: I am to, that's two of us, Curtis. [questioning resumed]
>
> .     .     .     .     .
>
> *Police*: Come on, Curtis, come on and tell me about it. You want to go home?
> *Moore*: Yeah.
> *Police*: Well, come on and tell me about it then and we'll go.
> *Moore*: I don't know nothing.
> *Police*: Tell me everything that happened and we will go.
>
> .     .     .     .     .
>
> *Moore*: No, I want to go home.
> *Police*: Huh?
> *Moore*: My mother expecting me.
> *Police*: Was the woman last week expecting you? [questioning continued]
>
> .     .     .     .
>
> *Police*: You know, you know you went on down and waited, Curtis. Why don't you go on and tell us about it so we can take you on home. You want to tell us about it? Come on and tell us about it so we can take you on home. Ok? Go ahead and tell us now and then we all won't have to sit here a long time, so we can take you on home. Go ahead and tell us what happened now. Go ahead and tell us so we can take you on home, ok? Come on and tell us what happened now. Come on and tell us so we can take you on home. It's raining, so you can go on home and watch television and go to bed. You want to tell us about it? Come on and tell us, Curtis, so we can take you on home. Hadn't you rather tell us than anybody else? Huh? Come on and tell us, you've got to tell somebody about it, you might as well tell us. Go ahead and tell us what happened now. Go ahead and tell us Curtis. Tell us exactly what happened so we can take you on home, ok? Tell us what happened after you met her last week on the street. Come on and tell us so we can take you on home. We want to go home, too. Ok? Just go ahead and tell us exactly what happened. Come on so we can go home.
> *Moore*: I don't know nothing.
> *Police*: Come and tell us Curtis. You're ready to tell us now, go ahead and tell us so we can go home, ok? Tell us what happened. Curtis? Curtis, go ahead and tell us what happened so we can go home, ok? And so you can go home. Come on and tell us, then we can go get something to eat, then we can all go home and get something to eat, ok? We know you didn't we know you didn't mean to hurt her or nothing, just tell us what happened, ok? Go ahead and tell us. We know you didn't mean to, just tell Lieutenant Daughtery and myself, we're going to sit here and listen at you, exactly what you say and we're not going to say anything to you, just go ahead and tell us what happened.
> *Moore*: Palotine, Palotine, where have you been? (Singing)
> *Police*: Curtis, Curtis, look at me. Curtis, look at me. You ready to go home?
> *Moore*: Uh huh.
> *Police*: Well, tell us what happened then.
>
> .     .     .     .
>
> *Police*: .     .     .     . You tell me what happened. We're tired of messing around here now we're ready to go home. Tell me what happened so you can go home too. What happened last week?
>
> .     .     .     .
>
> *Police*: Curtis, Curtis, you all right now?
> *Moore*: I'm sleepy.
> *Police*: Huh?
> *Moore*: I'm sleepy.
> *Police*: You want to go home?
> *Moore*: Yes.
> *Police*: Well, why don't you go ahead and tell us about it then? What happened after you knocked on the door?
>
> .     .     .     .     .
>
> *Police*: That's good, now, you're telling us how things happened. That's what I want so we can go home after a few minutes. I know you are ready to go home, aren't you.
> *Moore*: Uh huh.

*Miranda* warnings were required due to the noncustodial nature of the suspect's situation. Unlike petitioner, Mathiason was left a note at his dwelling *asking* him to contact a state policeman "to discuss something" with him. Mathiason subsequently called the officer and agreed to meet him at a mutually convenient place—a state patrol office. Mathiason was specifically told at his interview that he was not under arrest. On the other hand, petitioner was not asked to come down to the police station, but was "picked up" and "hauled in" by the police to the station. The police never informed petitioner that he was not under arrest, but instead held petitioner in an environment with all the objective indicia of arrest.

■ The Court thus finds that the prosecution failed to bear its burden of proving a proper reading of *Miranda* rights to petitioner. Further, the Court finds that the trial court applied an improper legal standard for determining when petitioner's entitlement to the *Miranda* warnings came into play.

### III.

■ Perhaps more important than the prosecution's failure to prove a proper and timely reading of *Miranda* warnings was its total neglect of proving that petitioner waived his rights once so informed. After a suspect is informed of his rights, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1628.

Whereas the prosecution presented very little evidence that petitioner had been informed of his rights, it failed to put on *any* evidence at the suppression hearing of a waiver of those rights by petitioner. Further, the trial court denied petitioner's motion to suppress without finding a waiver in the record. Only at trial, in response to a direct question by the court, did the Sheriff testify that petitioner waived his right to remain silent and his right to the presence of counsel.

■ Due to the fact that the trial court made no finding of waiver and the fact that the existence of a waiver is a question of law and not fact, *Brewer v. Williams, supra,* 430 U.S. at 403, 97 S.Ct. at 1241, this Court must make its own determination of whether the prosecution proved an intentional and knowing relinquishment by petitioner of his Fifth and Sixth Amendment rights by a preponderance of the evidence. Factors relevant to a waiver determination include the presence or absence of a written or verbal waiver,[4] the presence or absence of any coercion in the interrogation, the intelligence[5] and age[6] of the suspect, and the presence or absence of an affirmative statement by the suspect that he understood the rights.

■ The Court finds that the prosecution failed to bear its "heavy burden" of demonstrating a valid waiver by petitioner of his *Miranda* rights. The only testimony supporting a finding of waiver, as noted above, occurred after the trial court had ruled on the motion to suppress:

*Sheriff*: He said, I asked him did he understand the rights and he said, yes, and I asked him would he talk with me at this point without having an attorney present and he said I will talk with you, but I have not been to the woman's home.

---

**4.** See *Blackmon v. Blackledge,* 541 F.2d 1070, 1072 (4th Cir. 1976).

**5.** *See, e. g., Pierce v. Cardwell,* 572 F.2d 1339, 1343 (9th Cir. 1978) (suspect's mental state a critical factor in waiver determination); *United States v. Brown,* 557 F.2d 541, 548 (6th Cir. 1977); *United States v. Thompson,* 417 F.2d 196 (4th Cir. 1969).

**6.** *See, e. g., United States v. Miller,* 453 F.2d 634 (4th Cir.), *cert. denied,* 406 U.S. 923, 92 S.Ct. 1790, 32 L.Ed.2d 123 (1972) (burden of proving waiver heavy with a 14 year old suspect).

Yet, as with the alleged reading of the *Miranda* warnings, these statements by petitioner are nowhere to be found on the tape recording of the interrogation. Similarly, no signed waiver was secured and introduced into evidence and no corroborative testimony appears in the record attesting to petitioner's alleged waiver. Petitioner, if not unintelligent, was, as shown by the transcript of the interrogatories, surely mentally disoriented and the Sheriff knew of his prior hospitalization for mental disorders.

The Court must begin with a presumption against waiver, to be overcome only by a strong showing of an informed and volitional relinquishment by petitioner of his rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Although no particular procedure for securing a waiver is constitutionally required, *United States v. Robinson*, 593 F.2d 573, 577 (4th Cir. 1979), "the prosecution's burden is great" to show that petitioner did reject the offer of counsel and the opportunity to remain silent. *North Carolina v. Butler, supra*, 441 U.S. at 373, 99 S.Ct. at 1757. That burden is made heavier when the suspect is known to be mentally disturbed, just as it is when he is a juvenile or a person of low intelligence. This burden may not be carried by the uncorroborated statement of the interrogator that petitioner said he understood his rights and waived them.

The Court thus finds that there was an insufficient showing of a waiver of petitioner's rights under *Miranda* and therefore the convictions based upon petitioner's statements used against him at trial may not stand.

The writ shall issue.