## Richmond

### WILLIAM S. V. PATTERSON

### V.

### COMMONWEALTH OF VIRGINIA

October 16, 1981.

Records Nos. 810244
and 810267.

Present: All the Justices.

*Chris A. Christie* (*Decker, Christie & Hitchings*, on brief), for appellant.

*Richard B. Smith, Assistant Attorney General* (*Marshall Coleman, Attorney General*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

The dominant question in this criminal appeal involving automatic review of a death sentence is whether, as to the issue of punishment in the capital case, the jury was properly selected.

Defendant William S. V. Patterson was indicted for the robbery and capital murder of his 76-year-old grandmother. He was convicted by a jury of both offenses. His punishment for the robbery was set at life imprisonment. During the second phase of the bifurcated capital proceeding, the jury fixed defendant's punishment for the murder at death. In a subsequent hearing held after preparation of a probation officer's report, the trial court sentenced defendant in accord with the jury verdicts in a judgment order entered October 14, 1980.

The sentence of death is before us for review as of right. We have consolidated this review with defendant's appeals of his capital murder and robbery convictions.

In a pre-trial motion, defendant submitted a list of 82 questions to be asked of prospective jurors upon voir dire examination at the trial of the case. Among the proposed questions were the following:

"78. Do you believe that the death penalty is ordinarily the proper punishment for the crime of capital murder?

"79. If you sat as a juror in this case, and if the jury should happen to convict the Defendant of capital murder, would you be able to consider voting for a sentence less than death?"

In a hearing prior to trial, the court below refused defendant's request to ask the foregoing questions.

During the voir dire at trial, the court propounded only two questions dealing specifically with the veniremen's views about capital punishment. They were:

"Members of the jury panel, in one of the indictments the accused is charged with an offense in which, if there is a finding of guilty, the death penalty could be imposed. If you will, listen carefully to this question.

"Do any of you have any opinion such as to prevent your convicting anyone of an offense punishable with death?

* * *

"On the same subject, the next question is: Is there any member of the jury panel who never could vote to impose the death penalty or who would refuse even to consider its imposition in this case?"

There was no affirmative response from the panel to those queries.

On appeal, defendant points out that under *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), veniremen constitutionally may be excluded for cause if they are irrevocably committed to voting against the death penalty. *See Coppola* v. *Commonwealth*, 220 Va. 243, 250, 257 S.E.2d 797, 802 (1979), *cert. denied*, 444 U.S. 1103 (1980). Thus, defendant concedes that the two questions asked by the trial judge were proper. He argues, nevertheless, that if the prosecutor has a right to exclude such veniremen for cause, "certainly the Defendant should have a right to exclude for cause those jurors who are irrevocably committed to voting for the death penalty" in the event of a conviction of the capital offense. Consequently, defendant urges, the refusal of the trial judge to ask questions 78 and 79 denied him the right to a fair and impartial jury.

The Attorney General contends that even though the venire was free of jurors who were unalterably opposed to the death penalty, "this would not mean that such a 'death-qualified' jury tended to favor the prosecution," citing *Witherspoon,* 391 U.S. at 517-18. The State asserts that "it is manifest that the instant jury, although 'death-qualified', was not . . . unrepresentative or biased on this point," and that the trial court correctly refused to inquire, in effect, whether any of the prospective jurors were unalterably committed to the "Biblical admonition of 'an eye for an eye'." *Witherspoon,* 319 U.S. at 536 (Black, J., dissenting).

■ Under the Federal and State Constitutions, U.S. Const. amends. VI and XIV; Va. Const. art. 1, § 8, an accused has a right to trial by an "impartial jury." By statute a juror must "stand indifferent in the cause." Code § 8.01-358. *See* Rule 3A:20. These guarantees require jurors to be impartial not only upon the issue of guilt or innocence but also upon the question of punishment.

Applying these constitutional and statutory requirements, we have recently considered in another capital case whether a trial court properly refused to ask similar questions on voir dire dealing with the circumstances under which a prospective juror would vote for the death penalty. In *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), the trial judge refused to ask a series of three questions inquiring whether the veniremen felt that every person convicted of the unlawful killing of another during a robbery should receive the death penalty. 221 Va. at 522 n.8, 273 S.E.2d at 42 n.8. There, we held the trial court committed no error in refusing to ask the questions proposed by defense counsel. We said that the "voir dire questioning conducted by the trial judge probed many of the areas touched upon by these questions and assured the removal of those who would invariably impose capital punishment." 221 Va. at 523, 273 S.E.2d at 42-43. We concluded the *Turner* trial court "preserved the defendant's right to a fair and impartial jury" and that its refusal to ask the proffered questions "was not an abuse of discretion." *Id.*

An examination of the *Turner* record on file in our Clerk's Office reveals that among the voir dire questions asked was:

"Do you feel that regardless of the facts or circumstances that in every case of murder the death penalty should be imposed?"

As we pointed out in *Turner,* that question explored the veniremen's predilection for imposing the death penalty.

But in the present case, no questions were asked by the court below touching that subject. The prosecutor asked, "Do any of you have any philosophical, religious or moral beliefs that would prevent you from sending the man to the penitentiary should the Commonwealth prove his guilt beyond a reasonable doubt?" That query merely sought to eliminate those veniremen unalterably opposed to incarceration. And the Commonwealth does not argue that such question bore on the topic of the juror's attitudes about capital punishment.

■ Without addressing *Turner,* the Attorney General suggests, however, that the Supreme Court in *Witherspoon* "indicated" that when prospective jurors are stricken for being unalterably opposed to the death penalty, "the resulting jury would be *neutral* with respect to penalty." *See Witherspoon,* 391 U.S. at 520. We do not read the "indication" in *Witherspoon* to carry the precedential force urged by the Commonwealth. *See Adams v. Texas,* 448 U.S. 38, 49 (1980). Furthermore, implicit in this branch of the Attorney General's argument, as we understand it, is the suggestion that a jury devoid of those unalterably opposed to capital punishment is "neutral" and impartial, even though it is composed of persons who are unalterably committed to assessing the death penalty, regardless of the circumstances of the case. To state the proposition is to demonstrate its unfairness. We believe that the process of selection of an impartial jury permits elimination for cause of those veniremen who are biased in favor of the death penalty under all circumstances as well as those who are biased against its imposition under all circumstances.

Accordingly, we hold that the trial court erred in refusing to ask proposed question 79, or its equivalent.* Unlike *Turner,* the trial court by such refusal abused its discretion and failed, as to the penalty phase, to preserve fully the defendant's right to a fair and impartial jury. This constituted prejudicial error and invalidates the sentence to death.

■ Such a conclusion, however, does not invalidate the conviction. *Witherspoon,* 391 U.S. at 522-23 n.21. A jury qualified by unconstitutional standards respecting punishment is not necessarily biased with respect to a defendant's guilt. *Bumper v. North*

---

* Question 78 was properly refused. It was vague, argumentative, and non-specific.

*Carolina,* 391 U.S. 543, 545 (1968). *See Snider* v. *Cox,* 212 Va. 13, 181 S.E.2d 617 (1971). Accordingly, and in view of the posture of this proceeding, we must consider its ultimate disposition.

■ Under our statutory framework, there are only two available punishments if a defendant is found guilty of capital murder as defined by Code § 18.2-31: first, a sentence to death, or second, a sentence to life imprisonment. Code §§ 18.2-10, 19.2-264.4, and -264.5. And, upon review of the sentence of death, this Court is given the power by statute to "[c]ommute the sentence of death to imprisonment for life." Code § 17-110.1(D).

■ The statutory design inhibits a remand of this case for a new trial limited to the penalty issue only; this is because Code § 19.2-264.3 provides that if a defendant is found guilty by a jury of a capital offense, the *same* jury shall fix the punishment. Code § 19.2-264.3(C). Manifestly, the same jury that convicted Patterson should not now be reconvened upon a remand.

Thus, we must exercise our statutory power to commute the death sentence, provided we find no reversible error upon the issue of Patterson's guilt under the indictment charging capital murder. If there is no such error, the death sentence imposed upon the jury's finding of guilt of that offense will be commuted here to life imprisonment. Accordingly, we will proceed to examine the evidence relevant only to the issues remaining in the capital murder case not mooted by our decision on punishment, and the evidence relevant only to the robbery conviction.

Viewed in the light most favorable to the Commonwealth, the evidence shows that on the day of the crimes, April 15, 1980, defendant, Kavetta Mimms, and defendant's grandmother, Sarah Patterson, had been at the grandmother's Norfolk home almost continuously from late afternoon until late in the evening. During the period, the trio had been consuming alcoholic beverages. They were with other persons who frequented the grandmother's premises purchasing drinks from her and who occasionally occupied rooms in her home that she rented on an hourly basis. About 10:30 p.m., all of the customers departed leaving defendant, a 37-year-old longshoreman who resided with his wife and children in Virginia Beach, and Mimms, his constant female companion, alone in the home with the grandmother. Mimms was renting a room on a permanent basis from the grandmother.

Shortly after the last customer left, and while Mimms was about "to clear away glasses and empty ashtrays," Mimms saw

defendant walk toward the grandmother, who was sitting in a living room chair, and slap her on the side of the head with force sufficient to knock her to the floor. As Mimms was trying to lift the victim from the floor, defendant proceeded to kick his grandmother, who was intoxicated, several times as she was lying on the floor. Stating he was going to kill the victim and calling her filthy names, defendant obtained an eight-inch kitchen knife and proceeded to stab the victim in her back 18 times. Defendant then struck her in the head with an empty whisky bottle, breaking the bottle.

After the attack, defendant began tearing the victim's clothes as if searching for something. The evidence showed the victim often carried large amounts of cash on her person. Defendant then took the victim's gold and diamond ring from her finger. Upon determining the grandmother was dead (a subsequent autopsy showed death resulted from the knife wounds), defendant told Mimms not to tell anyone what he had done. He then began tearing apart the household furnishings to make it appear that the home had been burglarized and the victim robbed before she was killed. Defendant also took money from the victim's purse.

The couple then left the scene and defendant drove them to the home of one Ellen Ridley. They arrived there about 11:30 p.m., and remained most of that night. About 6:30 a.m. on April 16, defendant and Mimms returned to the victim's home, looked at the body, and called the police.

The evidence further showed that defendant had a habit of borrowing money from the grandmother, that he was in financial difficulty, and that he knew that his grandmother had designated him in her will as the sole beneficiary of her estate.

Even though defendant and Mimms initially disclaimed knowledge of the circumstances of the crimes, they were both arrested on April 16. Defendant was subsequently indicted for robbing Sarah Patterson of, among other items, the diamond ring. Code § 18.2-58. He was also indicted for the wilful, deliberate, and premeditated killing of the victim in the commission of robbery while armed with a deadly weapon, a capital offense under Code § 18.2-31(d).

■ On appeal, defendant properly consolidates the assignments of error into a series of questions presented. *See* Rule 5:42(c). First, defendant contends the trial court erred in permitting the prosecutor to present evidence of "prior bad acts" by defendant,

*i.e.,* the killing of his father, the shooting of another man, and his use of drugs. The issue arose in the following manner.

For more than a month after her arrest, Mimms maintained to the police that she and defendant were not present when the victim was killed. Then, while indicted for the same crimes as defendant, Mimms changed her account of the episode upon her attorney's advice that she tell the truth.

During Mimms' direct examination as a witness for the Commonwealth, and after she had testified that defendant committed the crimes in question, she was asked why she had initially given a different account of the events of April 15. Noting defendant had told her not to tell what he had done, Mimms said that she was afraid defendant "might do something to" her because:

> "Well, he had told me in a conversation that he had killed his father and I have seen him on an occasion having a fight with a guy and the guy came out of it with a gunshot wound. I knew that he would hurt me. That's why I was afraid."

The prosecutor then had Mimms identify a revolver, recovered by the police from defendant's automobile, as the gun he had used in the previous fight. No objection was made by defense counsel to any of this testimony.

During closing argument while addressing Mimms' credibility, the prosecutor commented that Mimms feared defendant because "he did kill his own father." The prosecutor also argued, exhibiting the revolver, that Mimms had seen defendant "shoot at a man" with the gun while in a fight. Defense counsel objected to the statements and moved for a mistrial.

Defendant argues the testimony was inadmissible and the argument improper because of the references to prior independent crimes. He relies on the proposition that in the trial of an accused for a specific offense, it is usually improper to admit evidence against him of an independent crime, citing *Roy v. Commonwealth,* 191 Va. 722, 726, 62 S.E.2d 902, 903 (1951). He argues that the challenged information should not have been put to the jury because it fell within none of the exceptions to the foregoing rule. *See Jordan v. Commonwealth,* 216 Va. 768, 770-71, 222 S.E.2d 573, 575-76 (1976).

We hold the trial court committed no error in respect to either the testimony or the argument. As to the testimony, the

defendant is precluded from attacking its admission for the first time on appeal because there was no contemporaneous objection noted at the trial. Rule 5:21. In addition, the testimony was properly received. It was not offered, as defendant suggests, as affirmative evidence to show defendant committed the crimes with which he was charged. Rather, it was directed to the issue of Mimms' credibility and to explain her reason for fearing defendant, in order to account for a prior inconsistent statement. Before Mimms testified, one of the investigating police officers stated Mimms told him, when he first arrived at the scene of the crime, that the only problem was "there was a female in the kitchen who was possibly sick." Consequently, after Mimms testified she knew at the time the female victim was dead, the trial court, under the circumstances of this case, did not abuse its discretion in permitting the prosecutor, during direct examination, to present Mimms' explanation of the inconsistency. Also, during defendant's cross-examination of Mimms, the same line of questioning was pursued. Defense counsel referred to other inconsistent statements made by Mimms to the police and asked her why she had not told the police the truth; Mimms again explained that she was afraid. An objection to evidence cannot be exploited on appeal by a party who has, at some other time during the trial, voluntarily elicited evidence of the same character. *Saunders* v. *Commonwealth,* 211 Va. 399, 401, 177 S.E.2d 637, 638 (1970); *Whitten* v. *McClelland,* 137 Va. 726, 741, 120 S.E. 146, 150 (1923).

As to the closing argument, the trial court committed no error. Following defendant's motion for a mistrial, the trial court promptly, clearly, and in great detail instructed the jury that the challenged information was to be considered only as it related to Mimms' "state of mind," and that there was no evidence that defendant had committed other assaults. This strong admonition by the trial court to the jury cured any possible prejudice to defendant that may have resulted from the prosecutor's argument. *Lewis* v. *Commonwealth,* 211 Va. 80, 175 S.E.2d 236 (1970).

As to references about defendant's drug use, he complains of the admission into evidence during redirect examination of Mimms of a letter he wrote to Mimms while she was in jail in April of 1980. In the letter, defendant suggested they both enroll in the same drug program so they could see one another. Defendant says allusion to his prior drug use prejudiced him. We reject this contention because, as the trial judge noted, defendant opened

the door for the introduction of such evidence by his cross-examination of Mimms. Defendant attempted to show Mimms wanted to enroll in a drug program. This was presumably an attempt by defendant to implicate Mimms in the killing by showing she had a need for funds because of a drug problem at the time of the murder.

Next, defendant argues the evidence was insufficient as a matter of law to establish that a robbery occurred. The common-law crime of robbery is defined as the taking of the personal property of another, with the intent to steal, from his person or in his presence, and against his will, by violence or intimidation. *Jones* v. *Commonwealth,* 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977). Defendant argues the Commonwealth failed to prove that the violence which occasioned the death of the victim was done for the purpose of robbing her. He also contends that since the taking of the ring occurred after the victim's death, the taking could not be from the "person" or against her will "since a mere carcass is not a person and has no will to violate." We disagree. The violence, in order to constitute an essential element of robbery, must precede or be concomitant with the appropriation of the property from the person or presence of the owner. *Stamper* v. *Commonwealth,* 220 Va. 260, 274, 257 S.E.2d 808, 818 (1979), *cert. denied,* 445 U.S. 972 (1980). Here, the evidence is overwhelming to support the inference that defendant killed his grandmother in an effort to obtain money or items of value from her. Moreover, we reject out of hand the notion that because the taking occurs minutes after the victim is killed, the taking is not from the "person." Thus, we hold the Commonwealth proved beyond a reasonable doubt that a robbery occurred and that the victim was killed in the commission of the robbery.

Finally, we summarily dispose of defendant's remaining two contentions. There is no merit either to the suggestion that the trial court erroneously admitted evidence of prior consistent statements of Mimms to bolster her testimony, or to the argument that the court below erred in refusing to instruct the jury about the legal effect on premeditation of voluntary intoxication. We note in passing as to the latter issue that the evidence relating to defendant's conduct during and after the crimes is utterly insufficient to raise an issue for the jury that he was so intoxicated as to render him incapable of committing a wilful, deliberate, and pre-

meditated act designed to kill the victim. *Hatcher* v. *Commonwealth*, 218 Va. 811, 241 S.E.2d 756 (1978).

For these reasons, we conclude there is no error in the judgment appealed from insofar as it convicts and punishes defendant for robbery, and insofar as it convicts defendant of capital murder. As we have said, however, for the error as to penalty in selecting the jury in the capital case, we will commute defendant's death sentence to a sentence to imprisonment for life. Consequently, the judgment below will be

> *Affirmed in part,*
> *reversed in part,*
> *modified, and*
> *final judgment.*

THOMPSON, J., dissenting in part.

The majority concludes that the statutory scheme for death penalty cases forbids a new trial only on the penalty issue because Code § 19.2-264.3(C) provides that the "same jury" which determines guilt shall also fix the punishment. I do not believe that this statute should be so narrowly construed.

In *Snider* v. *Cox*, 212 Va. 13, 181 S.E.2d 617 (1971), the defendant had been convicted of rape and sentenced to death. The death sentence was set aside because the jury selection, on the issue of punishment alone, was not in accordance with *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968). This court remanded the case for a new trial on punishment alone.*

I believe that Code § 19.2-264.3(C) upholds this traditional procedure. Properly construed, the phrase "same jury" possesses a temporal, not a substantive meaning. The General Assembly intended that the group of jurors try both the guilt and penalty phases only when the penalty phase immediately followed the guilt phase.

The majority opinion finds error in the penalty phase of the jury selection process and atones for this error by commuting the sentence from death to life. Again, I do not believe that the General Assembly intended this result.

---

* At that time Code § 19.2-264.3(C) was not in existence nor was there any provision for bifurcated trials in rape or homicide cases.

The controlling statute, Code § 17-110.1, provides in part:

**Review of death sentence.** A. A sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court.

. . . .

D. *In addition to the review and correction of errors in the trial of the case,* with respect to review of the sentence of death, the court may:

1. Affirm the sentence of death; or
2. Commute the sentence of death to imprisonment for life. [Emphasis added.]

The statute does not say that trial errors may be corrected by commutation of sentence, and I do not believe that was contemplated. The majority has yielded to the "tyranny of labels" and thus seriously impairs the death penalty statute. Otherwise I concur in the opinion of the majority.