## Richmond

WILBERT LEE EVANS

V.

COMMONWEALTH OF VIRGINIA

Record No. 840474.

November 30, 1984.

Present: All the Justices.

*Jonathan Shapiro (Gary Myers; Jonathan Shapiro and Associates, P.C.; Howard and Howard, P.C.,* on brief), for appellant.
*Donald R. Curry, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is the automatic, priority review of a sentence to death. Previously, upon similar review, we affirmed an earlier death sentence imposed on the defendant for the same crime. Subsequent to the affirmance, the defendant instituted a state habeas corpus proceeding. As the result of information developed in the habeas case, the Commonwealth confessed error and the first death sentence was set aside. Following a resentencing proceeding, the present death sentence was imposed. The principal issue in this appeal is whether defendant's sentence should be vacated because of the alleged violation of the *ex post facto* clauses of the state and federal constitutions.

The chronology sets the stage. On January 27, 1981, Wilbert Lee Evans, a prisoner, fatally shot a deputy sheriff who was escorting him to jail in Alexandria. About four months later, a jury convicted defendant of capital murder in the willful, deliberate, and premeditated killing of a law-enforcement officer for the purpose of interfering with the performance of the officer's official duties. Code § 18.2-31(f). In the sentencing phase of the bifurcated trial, the same jury recommended the death penalty, based solely upon a finding of "future dangerousness." The Commonwealth relied mainly on records of seven purported out-of-state convictions of defendant. The jury determined that after consideration of Evans' prior history, there was a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society. *See* Code § 19.2-264.4(C). On June 1, 1981, the trial court sentenced defendant to death.

On October 16, 1981, in the case of *Patterson v. Commonwealth*, 222 Va. 653, 283 S.E.2d 212 (1981), we commuted a defendant's death sentence to imprisonment for life. There, we held that the lower court had failed, in the penalty phase of that bifurcated trial, to preserve fully the defendant's right to a fair and impartial jury. There was no error in the guilt phase of the trial but the sentence to death was invalidated. We further decided that the statutory framework existing at the time inhibited a remand of the case for a new trial limited to the penalty issue only. This was because Code § 19.2-264.3(C) provided at the time that if a defendant was found guilty by a jury of a capital offense, the *same* jury must fix the punishment. We said: "Manifestly, the same jury that convicted Patterson should not now be reconvened upon a remand." 222 Va. at 660, 283 S.E.2d at 216.

On December 4, 1981, we affirmed Evans' conviction and sentence to death. *Evans v. Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981). About four months later, the Supreme court of the United States denied defendant's petition for a writ of certiorari. 455 U.S. 1038 (1982).

Within a month, in April of 1982, defendant filed a petition for a writ of habeas corpus in the trial court. In May and December of 1982, defendant filed amendments to the habeas corpus petition to reflect new claims. In the May amendment, the defendant alleged that at least two of the seven purported North Carolina convictions relied on by the prosecutor during the penalty phase of defendant's trial actually were not convictions at all. The defendant alleged that one charge, assault on a police officer with a deadly weapon, had been dismissed after an appeal. He asserted that another charge, engaging in an affray with a knife, also had been appealed. In a trial *de novo* on that charge, defendant was again convicted, but the record used in his capital murder trial listed both convictions for use of the knife and no attempt was made to explain this duplication to the jury.

Effective March 28, 1983, emergency legislation adopted by the General Assembly was approved amending the relevant death penalty statutes because of the *Patterson* decision. Code § 19.2-264.3 was amended to provide that "[i]f the sentence of death is subsequently set aside or found invalid, and the defendant or the Commonwealth requests a jury for purposes of resentencing, the court shall impanel a different jury on the issue of penalty." Acts 1983, ch. 519.

About two weeks later, an Assistant Attorney General of Virginia wrote a letter to the trial judge confessing error in the defendant's sentencing proceeding and acknowledging that Evans' death sentence should be vacated. The April 12, 1983 letter indicated that "unbeknownst to the prosecution or defense counsel at the trial" many of the records of convictions were "seriously misleading" or "otherwise defective." It had been discovered that not only were three purported convictions actually one but several of the other convictions were obtained when Evans apparently had appeared without counsel. On May 2, 1983, the trial court entered an order setting aside defendant's death sentence and granting a hearing to determine whether defendant should be resentenced or his sentence reduced to life imprisonment.

On September 21, 1983, an evidentiary hearing was held and, by order entered October 12, 1983, the trial court denied defendant's motion to bar the Commonwealth from again seeking the death penalty. On January 30, 1984, the trial court impanelled a new jury for a resentencing hearing, in accordance with amended Code § 19.2-264.3. At the conclusion of the hearing, the jury fixed punishment at death. On March 7, 1984, the trial court entered the order appealed from imposing the death penalty.

We shall address the issues in the order presented by the defendant. They involve the *ex post facto* violation, two claims of prosecutorial misconduct, double jeopardy, misdirection of the sentencing jury, and denial of equal protection. The relief sought by the defendant is either a reversal of the trial court's decision which allowed resentencing and replacement of the sentence of death with a sentence of life imprisonment, or, commutation of his sentence to life imprisonment, or, remand of the case to the trial court for a new sentencing hearing.

Defendant contends that application of the revised sentencing law to him violates the prohibition against *ex post facto* laws. According to Evans, the *Patterson* decision made clear, until Virginia's death penalty statutes were amended by emergency legislation on March 28, 1983, that this Court had but two options in reviewing a sentence of death. The Court could affirm the sentence to death or commute the sentence to life imprisonment. A remand for resentencing in the case where the original jury was "tainted" was not possible, the defendant argues. Accordingly, Evans says, under the law as it existed at the time he committed his offense, at the time he was tried, at the time his first conviction was affirmed, and at all times before approval of the emergency legislation, he was entitled to a sentence of life imprisonment upon the setting aside of his death sentence. He argues that as the result of *Patterson*: "Automatic commutation in such situations thus became a part of Virginia's law just as surely as if it had been drafted by the legislature."

Evans contends that had the errors which led to the Commonwealth's confession of error been brought to our attention at the time of his first appeal, we would have done precisely in *Evans* what we had done seven weeks previously in *Patterson*, and Evans would have received a life sentence. He contends the considerations which led the Court to commute Patterson's sentence, that is, the impropriety of recalling Patterson's improperly selected

jury, applied with full force to Evans' case. His jury had been irreparably "tainted" by exposure to at least five invalid convictions, he says. Defendant concludes that it was error of constitutional dimension to try him under a revised sentencing scheme which was not in effect until more than a year after his conviction was final, "and which replaced his statutory right to a life sentence with the renewed prospect of death." We reject defendant's contentions and conclude that there has been no *ex post facto* violation.

Whether a defendant has a "right," or is "entitled," to a life sentence if his death sentence is set aside is irrelevant in an *ex post facto* analysis. "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver* v. *Graham*, 450 U.S. 24, 30 (1981). Pertinent to the *ex post facto* inquiry is whether the defendant had "fair warning as to the degree of culpability which the State ascribed to the act of murder." *Dobbert* v. *Florida*, 432 U.S. 282, 297 (1977); *Smith* v. *Commonwealth*, 219 Va. 455, 475, 248 S.E.2d 135, 147 (1978), *cert. denied*, 441 U.S. 967 (1979). Manifestly, Evans had "fair notice" and "fair warning" at the time of his 1981 offense that the capital murder of a law-enforcement officer was a crime for which the death penalty could be imposed. Code §§ 18.2-31(f) and 18.2-10(a). Virginia's view of the severity of capital murder and of the degree of punishment which the General Assembly wished to impose upon capital murderers had been clearly announced before Evans' criminal conduct occurred.

Defendant argues in rebuttal, however, a full "fair warning" inquiry must take into account that Evans was also deemed to understand that if he were to receive a death sentence and if his death sentence were to be set aside, his punishment would be life imprisonment. Defendant notes the following statement in *Weaver*: "Thus, even if a statute merely alters penal provisions . . . it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." 450 U.S. 30-31 (footnote omitted). He contends it was improper to impose a more onerous sentencing procedure upon him than was in place at the time of his crime.

There are at least two answers to this contention. First, according to *Dobbert*, the *ex post facto* inquiry focuses on "the quantum

of punishment attached to the crime," 432 U.S. at 294, of which the defendant had notice at the time of the offense, and not on adjustments in the method of administering that punishment that are collateral to the penalty itself. Second, the statutory amendment was not "more onerous" than the prior law; it was "ameliorative" and hence not *ex post facto.* 432 U.S. at 294; *Smith* v. *Commonwealth,* 219 Va. at 475, 248 S.E.2d at 147. As the Attorney General points out, "[t]he change insures that an accused, who has been fairly tried and convicted of capital murder, also receives a fair and impartial trial on the issue of punishment." Where, as here, there has been a judicial determination that a sentence to death is invalid because of error during the penalty stage, the new law provides for impanelling a new jury, free of any taint arising from errors during the first trial, to redetermine the defendant's punishment. A defendant convicted of capital murder is entitled to a fair and impartial determination of his punishment; he will not be heard to complain that a change in the law which protects that right is not wholly beneficial to him.

*Kring* v. *Missouri,* 107 U.S. 221 (1882), heavily relied on by defendant, is not controlling. There, at the time of the offense, an accused convicted in Missouri of second-degree murder was thereby acquitted of first-degree murder. Prior to Kring's trial, the Missouri Constitution was amended to provide that an accused could be retried for first-degree murder, notwithstanding his earlier conviction and sentence for murder in the second degree. Kring pled guilty to second-degree murder. On appeal, the conviction was reversed because of a breached plea agreement. Upon retrial, Kring was convicted of first-degree murder. The second conviction was reversed by the Supreme Court because the change in law operated *ex post facto.* The Court held that the new constitutional provisions eliminated what was, by the law of the state when the crime was committed, an absolute defense to the charge of first-degree murder. 107 U.S. at 229. Unlike the present case, the new law in *Kring* abrogated a substantial right which existed at the time of the offense. In contrast, Evans has been deprived of no substantial right.

Next, defendant contends the Commonwealth's Attorney knowingly used false evidence to obtain the original sentence to death and that such conduct so violated fundamental fairness and due process as to bar a subsequent sentencing proceeding. This

claim focuses on the flawed record of defendant's prior convictions.

The trial judge conducted a full investigation into this charge at the hearing on September 21, 1983. At the conclusion of the hearing, the court found from the evidence "that the defendant has failed to prove to the satisfaction of the Court that the prosecution engaged in such misconduct or tactics as to warrant the Court in concluding that the Commonwealth is precluded from again seeking the death penalty in this case." Although our review of the record convinces us that credible evidence supports the trial court's finding of fact, we will agree with defendant and assume, without deciding, that the Commonwealth's Attorney's handling of this particular phase of the original trial involved serious prosecutorial misconduct. Nevertheless, the defendant is not entitled to the relief he seeks.

In *United States* v. *Morrison*, 449 U.S. 361 (1981), the Supreme Court unanimously held that governmental action which involved "deliberate" and "egregious" conduct did not warrant dismissal of an indictment, absent a showing of "demonstrable prejudice, or substantial threat thereof . . . ." 449 U.S. at 365, 367. The Court indicated that a "drastic remedy" would be imposed only where the conduct could not be corrected by "traditional remedies." 449 U.S. at 365-66, n.2.

In the present case, the defendant has received, by a different jury, a new, full sentencing trial, free of flawed conviction records. This traditional remedy has been wholly adequate to remove any prejudice to the defendant caused by any prosecutorial misconduct during the penalty phase of his first trial.

In arriving at this conclusion, we do not condone the indifferent, careless manner in which introduction of the documentary records of defendant's prior convictions was handled by the prosecutor. During the hearing, the Commonwealth's Attorney admitted he knew, at the time the conviction records were proffered during the trial, that three of the purported convictions actually were only one. He testified, however, that he advised defense counsel of the discrepancy during the trial, and that he assumed the error would be explained to the jury by defense counsel during closing argument.

The records in dispute covered convictions in Wake County, North Carolina, during the period 1964-1972, as noted in our opinion in *Evans*, 222 Va. at 774-75, 284 S.E.2d at 820. Appar-

ently, most of the pre-1972 conviction records in that county had been destroyed. And, admittedly, the package of North Carolina documents available at trial was a "most incredible mess," according to the hearing testimony of defendant's trial counsel. Also, the evidence shows that the prosecutor had furnished defense counsel with some conviction information prior to trial and that defense counsel had travelled to North Carolina prior to trial to examine records of defendant's convictions. And, we recognize there was the factual dispute concerning whether the prosecutor notified defense counsel, during the trial, about the inaccurate records. Nevertheless, the flawed documents were proffered by the Commonwealth's Attorney, who had the duty to assure, as far as reasonably possible, that the records were accurate. If their correctness was in doubt, or if the prosecutor knew they were inaccurate in any particular, the documents should not have been offered in evidence.

■ Next, the defendant asserts that the Commonwealth's "purposeful delay" in conceding error in the defendant's original sentencing proceeding until the new statutory scheme was enacted, violated defendant's due process right. We do not agree.

The trial court stated at the conclusion of the September 1983 hearing: "I think the record is absent any showing that there was any maneuvering by the Attorney General or otherwise to put this case in position where, by some design, it would be cured by pending legislation." In the order entered after the hearing, the trial court stated that "the evidence fails to prove by a preponderance of the evidence that the Commonwealth purposefully and wrongfully delayed resolution of the defendant's petition for a writ of habeas corpus in order to achieve a tactical advantage as alleged by the defendant . . . ." The record amply supports the trial court's finding that there was no "purposeful delay" connected with the timing of the confession of error.

The Assistant Attorney General charged with handling defendant's first appeal and the habeas corpus proceeding testified in detail at the September 1983 hearing. In essence, he testified no effort was made within the office of the Attorney General to delay a confession of error in Evans' case until the amendatory legislation was approved. That evidence is credible, uncontradicted, and persuasive. The trial court examined *in camera* original files of the Governor's office and the Attorney General's office relating to drafting, introduction, consideration, and approval of the correc-

tive legislation. No evidence to support defendant's claim was found by the trial court as the result of that examination. We have conducted a similar examination of those records and have confirmed the trial court's conclusion. Accordingly, there is no merit to defendant's claim of wrongful conduct.

Next, defendant contends that resentencing violated the prohibition against double jeopardy, under the facts of this case. Relying on *Bullington* v. *Missouri*, 451 U.S. 430 (1981), defendant argues that principles of double jeopardy bar resentencing him to death, after his original death sentence was set aside by the habeas corpus court. *Bullington* is inapposite. There, a defendant was convicted of capital murder, but the jury sentenced him to life imprisonment rather than death, under Missouri's bifurcated trial procedure. Defendant obtained reversal of the conviction and a new trial. The Supreme Court barred a second attempt to impose the death penalty and ruled: "Because the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to him, with respect to the death penalty at his retrial." 451 U.S. at 446. But the obvious difference between that case and this is, in the present case, defendant has not been acquitted by a jury with respect to the death penalty.

In addition, the sentence to death in this case was set aside upon the ground of trial error and not evidentiary insufficiency. The defendant's sentence was annulled merely because the judicial process was defective, that is, evidence was received that should not have been offered. Accordingly, double jeopardy principles have not been offended. Under these circumstances, the accused has a strong interest in obtaining a fair readjudication of his punishment free from error, just as society maintains a valid concern for insuring that the guilty are punished and properly sentenced. *Burks* v. *United States*, 437 U.S. 1, 15 (1978).

Next, the defendant contends the trial court's instruction to the jury in the resentencing proceeding, that a sentence to life imprisonment required a unanimous vote of the jury, was contrary to the Virginia statutes and violated defendant's due process rights. Defendant dwells on the wording of the verdict forms contained in Code § 19.2-264.4(D). There, the death-penalty form requires the jury to "unanimously fix [defendant's] punishment at death," subsection (D)(1), while the life-imprisonment form

merely concludes that the jury may "fix his punishment at imprisonment for life," subsection (D)(2). Defendant argues omission of the word "unanimously" from the life-sentence form demonstrates a legislative intent that a verdict of life imprisonment need not be unanimous. Accordingly, the defendant urges, the trial court erred in responding to a question from the jury and in specifying a requirement of unanimity for a life sentence. There is no merit to this contention.

Under established Virginia law, the verdict in all criminal prosecutions must be unanimous. *See* Rule 3A:17(a). And we perceive no legislative intention to change that rule by virtue of the language of Code § 19.2-264.4(D). Any possible ambiguity created by the omission of the word "unanimously" from subsection (D)(2) of § 19.2-264.4 is resolved by subsection (E) of the statute, which specifies: "In the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life." Implicit in subsection (E), given our established law on unanimous criminal verdicts, is the conclusion that the jury must unanimously agree on both "the penalty" of death and "the penalty" of life imprisonment.

Finally, defendant asserts that sentencing him to death, when "all others" similarly situated with respect to the amended death penalty statutes received life sentences, deprived him of due process and equal protection under the Fourteenth Amendment to the United States Constitution and was fundamentally unfair. He contends that had the "grave errors which eventually caused the Commonwealth to concede the invalidity of Evans' death sentence been brought to this Court's attention at the time of his original appeal, his sentence of death would have been set aside." He says "there was simply no reason" to treat Evans differently from Patterson, whose case was decided only weeks prior to Evans' appeal. He contends that if he is now to receive the death penalty, while Patterson, "and perhaps others," did not, he will be denied the equal protection of the laws to which he is entitled. We disagree.

As the defendant points out, equal protection requires that similarly situated individuals be treated alike and that, because a non-suspect classification is involved here, the classification "rationally advances a reasonable and identifiable governmental objective." *Schweiker* v. *Wilson*, 450 U.S. 221, 235 (1981). We hold that Evans is not similarly situated with the defendant in *Patterson* with respect to the amendment to the death penalty statutes.

Virginia's current capital murder statutory framework became effective July 1, 1977. The amendment in question was approved and became effective March 28, 1983. Admittedly, both Evans and Patterson committed their crimes and were tried, convicted, and sentenced to death prior to the effective date of the amendment. Nevertheless, there is a significant difference between Patterson's case and Evans' case. Patterson's sentence to death was commuted to life imprisonment before the effective date of the statutory amendment; Evans' penalty was not set aside, and his resentencing trial did not commence, until after the effective date of the amendment.

As the Attorney General contends, Evans, in effect, asks us to decide that any defendant who originally was convicted and sentenced to death before the effective date of the amendment, must have the death sentence commuted to a life sentence *at any time* the death sentence is set aside. This would be the rule whether the death sentence was voided one day or twenty years after the effective date of the amendment. A state properly may draw the line at some point between those persons whose cases had progressed sufficiently far in the legal process to be governed by the old law and those individuals whose cases could properly subject them to the amended law. *Dobbert* v. *Florida*, 432 U.S. at 301. Because the subject statutory change affects only the procedure to be followed if a death sentence is set aside, we deem it more rational to classify individuals potentially affected by the change according to the time when the individual's death sentence was set aside, and the resentencing proceeding commenced, rather than at the time when the person was originally tried and convicted.

█ In conclusion, Code § 17-110.1 requires this Court, in addition to any errors enumerated by appeal, to consider and determine whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Upon the issue of arbitrariness, the jury based its finding on the "future dangerousness" factor, which was supported fully by the evidence. Defendant's prior history revealed criminal convictions in the District of Columbia and North Carolina. In 1964, he threatened a police officer with a knife. In 1974, he threatened prison officials with a knife while demanding transfer to another prison facility. In 1978, he killed a person during an

argument. In 1981, he assaulted and threatened credit union employees during an armed robbery.

The evidence regarding the present offense showed that Evans pretended to be a willing witness for the Commonwealth but that his sole purpose in cooperating was to engineer an escape after being brought to Virginia in custody from North Carolina. He planned to kill anyone who attempted to prevent his escape and he was acting on this intent when he killed the victim. In summary, we find that the sentence in this case was assessed by the jury free of the influence of passion, prejudice, or any other arbitrary factor.

Upon the issues of excessiveness and proportionality, our prior expression about Evans is as valid today as it was in 1981 when we decided his first appeal. "We have no hesitancy in concluding that juries generally in this jurisdiction will impose the death sentence for comparable crimes where inmates who kill prison guards have criminal records showing consistently turbulent, combative conduct and the probability of committing criminal acts of violence that will threaten the peace and security of the law-abiding public." *Evans* v. *Commonwealth*, 222 Va. at 780, 284 S.E. 2d at 824.

For the foregoing reasons, we conclude that the trial court committed no error. In addition, we independently have concluded from a review of the entire record that the sentence of death was properly assessed. Accordingly, the judgment below will be

*Affirmed.*