GREGORY WARREN BEAVER

V.

COMMONWEALTH OF VIRGINIA

Record No. 850828

GREGORY WARREN BEAVER

V.

COMMONWEALTH OF VIRGINIA

Record No. 850861

January 16, 1987

Present: All the Justices

*John H. Maclin, IV; T. O. Rainey, III*, for appellant. (Record Nos. 850828 & 850861)

*Donald R. Lee (Philip R. Brown; Hunton & Williams*, on briefs), for appellant, on ineffective assistance of counsel claim. (Record Nos. 850828 & 850861)

*Robert Q. Harris, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee. (Record Nos. 850828 & 850861)

THOMAS, J., delivered the opinion of the Court.

## I.  BACKGROUND

Gregory Warren Beaver pled guilty to capital murder, to wit: "the willful, deliberate and premeditated killing of a law-enforcement officer . . . when such killing is for the purpose of interfering with the performance of his official duties." Code § 18.2-31(f). Beaver also pled guilty to the use of a firearm in the commission of a felony. Code § 18.2-53.1. After the guilty pleas were accepted, the trial court heard evidence concerning the appropriate penalty. The trial court sentenced Beaver to death on the capital murder charge and two years imprisonment on the firearm charge.

Beaver appealed the capital murder conviction to this Court. (Record No. 850828.) He appealed the firearm conviction to the Court of Appeals. We certified the firearm conviction to this Court pursuant to the provisions of Code § 17-116.06 (Record No. 850861) and have consolidated that matter with the appeal of the capital murder conviction and the automatic sentence review mandated by Code § 17-110.1.

## II.  FACTS

On April 12, 1985, Trooper Leo Whitt of the Virginia State Police made a routine traffic stop of a blue Camaro on Interstate 95 in Prince George County. Beaver was the driver. He was accompanied by a hitchhiker he had picked up in Florida.

Trooper Whitt approached the car on the driver's side and requested defendant's license and registration. Defendant directed the passenger to look in the glove compartment for the documents. While waiting for defendant to produce the documents, Trooper Whitt walked to the front of the automobile and appeared to write down information from a license plate which was displayed in the front windshield.

The trooper returned to the driver's side and the passenger told defendant that he could not find the license and registration. At that moment, defendant raised a gun and shot Trooper Whitt. The trooper staggered back and "let out a groaning sound." It appeared he had been shot in the shoulder. The trooper started coming forward again, grabbing for his shoulder with his left hand while attempting to reach his gun with his right hand. At that point "defendant raised the gun again and paused and aimed and shot him again the second time." This time the trooper fell to the

ground. Defendant looked out the window "to see if [the trooper] was still laying there and took off down the highway."

After Beaver drove away he remarked, "Damn, I never shot a police officer before." When the passenger asked him why he had done it, Beaver said he was "not going back to jail for anybody." After defendant had driven from the interstate onto a side road he remarked, "I got away with shooting a police officer."

Beaver's case came on for trial on July 8, 1985. On that date, he pled not guilty and a jury was selected. However, on July 9, 1985, Beaver changed his plea to guilty. He was questioned extensively by the trial court concerning his plea. The trial court concluded that Beaver had a thorough understanding of "the nature and effect of his plea and of the penalties that may be imposed upon his conviction, and of the waiver of trial by jury and of appeal." The trial court accepted the written plea of guilty, found Beaver guilty of capital murder, and dismissed the jury. The trial court then held a sentencing hearing as provided in Code § 19.2-264.4(A). On September 16, 1985, Beaver was sentenced to death based on a finding of future dangerousness.

## III. ISSUES

On appeal, Beaver assigns numerous errors. He contends that the trial court erred as follows:

1. In failing to grant his motion for change of venue;
2. In refusing to order a Bill of Particulars;
3. In refusing to permit the defense to retain a private investigator;
4. In refusing to grant the defendant a reasonable time to prepare his defense;
5. In refusing to grant a motion to summons a new jury panel;
6. In excluding veniremen who were irrevocably opposed to the death sentence; and
7. In employing an unconstitutional and unfair method of jury selection.

He continues with allegations that the death penalty statute and the death penalty itself are unconstitutional; on these points he contends as follows:

8. That Code § 18.2-31 is unconstitutional because it constitutes cruel and unusual punishment, is vague, and constitutes a denial of due process and equal protection of the laws;

9. That Code § 18.2-31(f) is unconstitutional because it creates a special protected class, to-wit: police officers, thus denying the defendant equal protection;

10. That the statutory construction and the conditions for imposition of the death sentence are overly broad and impermissibly vague; and

11. That death by electrocution is cruel and unusual punishment.

He goes on to make assignments of error aimed specifically at the penalty phase proceedings. In that regard he contends as follows:

12. That the trial court erred in refusing to order an independent private psychiatrist to assist in the presentation of any defense;

13. That the trial court erred in permitting the introduction of evidence concerning alleged offenses as a juvenile;

14. That the trial court erred in permitting the introduction of evidence concerning alleged yet unconvicted offenses that occurred in the State of Maryland;

15. That the trial court erred in permitting the introduction of evidence concerning alleged offenses which occurred while defendant was held in the Petersburg City Jail;

16. That there was insufficient evidence to show future dangerousness to the extent needed to impose the death sentence;

17. That the death sentence in this case is excessive and disproportionate to the penalties imposed in similar cases; and

18. That the death sentence imposed in this case was imposed under the influence of passion, prejudice, and other extremely arbitrary factors.

We will discuss the various assignments of error in the three groupings set forth above.

## IV.  DISCUSSION

### A.  *Effect of Defendant's Guilty Plea*

■ The first ten assignments of error along with defendant's appeal of his firearm conviction must be disposed of on the same ground: these matters cannot be raised on appeal because Beaver pled guilty. We discussed the rule in *Peyton* v. *King*, 210 Va. 194, 169 S.E.2d 569 (1969), a case in which a criminal defendant sought habeas corpus relief for denial of his right to appeal a conviction that was based on his plea of guilty. The trial court granted the requested relief. We reversed. We held that absent a claim of a jurisdictional defect a conviction based on a guilty plea could not be appealed. We wrote as follows:

> [A] voluntary and intelligent plea of guilty by an accused is, in reality, a self-supplied conviction authorizing imposition of the punishment fixed by law. It is a waiver of all defenses other than those jurisdictional, effective as such not only in the lower court but as well in this court. Where a conviction is rendered upon such a plea and the punishment fixed by law is in fact imposed in a proceeding free of jurisdictional defect, there is nothing to appeal. To take any other view would give recognition to an empty right and permit frivolous appeals for the mere sake of delay.

210 Va. at 196-197, 169 S.E.2d at 571. *Accord Guthrie* v. *Commonwealth*, 212 Va. 550, 551, 186 S.E.2d 26, 28 (1972). *See also Tollett, Warden* v. *Henderson*, 411 U.S. 258 (1973); *Mason* v. *Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979) (a capital murder case in which the defendant pled guilty).

In *Tollett*, the United States Supreme Court reaffirmed what it said in *Brady* v. *United States*, 397 U.S. 742 (1970), concerning the effect of a guilty plea. The *Tollett* Court wrote as follows on the issue:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the depri-

vation of constitutional rights that occurred prior to the entry
of the guilty plea.

411 U.S. at 267. By the same logic, the defendant in this appeal
may not complain of any non-jurisdictional defects that occurred
prior to his guilty plea.

Defendant has advanced no reason why the general rule should
not apply in this case, and we perceive none. Therefore, we hold
that defendant's firearm conviction and the matters raised by him
in assignments of error one through ten, as set forth above, are not
cognizable on this appeal.

## B. *Constitutionality of The Death Penalty*

■ We turn now to defendant's contention that the death sen-
tence is unconstitutional because it is cruel and unusual. In mak-
ing this argument, Beaver relies upon and adopts the arguments
on the same point that were made by the defendants in *Martin* v.
*Commonwealth*, 221 Va. 436, 271 S.E.2d 123 (1980), *Whitley* v.
*Commonwealth*, 223 Va. 66, 286 S.E.2d 162, *cert. denied*, 459
U.S. 882 (1982), and *Stockton* v. *Commonwealth*, 227 Va. 124,
314 S.E.2d 371, *cert. denied*, 469 U.S. 873 (1984). Beaver readily
admits, however, that the arguments upon which he relies have
been considered and rejected by this Court in the several opinions
upon which he relies. We adhere to our previous rulings and we
reject Beaver's argument that the death penalty is cruel and
unusual.

## C. *Penalty Phase Matters*

### 1. *Appointment of a Second Independent Psychiatrist*

■ Beaver contends that the trial court erred in refusing to or-
der an independent private psychiatrist to assist in the preparation
of his defense. The bare assignment of error on this point suggests
a violation of *Ake* v. *Oklahoma*, 470 U.S. 68 (1985), where the
United States Supreme Court held that in certain circumstances
the States must provide indigent criminal defendants with "access
to a competent psychiatrist." 470 U.S. at 83. Upon closer review,
however, it is plain that there was no violation of *Ake* in the in-
stant case.

Beaver's precise argument, as set forth on brief, is that the trial
court erred "in refusing to appoint a *second* independent private

psychiatrist." (Emphasis added.) The record reveals that soon after defendant was formally charged, his counsel moved for the appointment of a private psychiatrist to examine and evaluate the defendant and to aid in his defense. That motion was granted on April 24, 1985, at which time the general district court appointed Dr. P. J. Reddy.

Nothing was said about the need for another psychiatrist until the morning of the first day of trial on July 8, 1985. At that time, defense counsel complained that, because they had not participated in the selection of Dr. Reddy, a new psychiatrist should be appointed. The trial court denied the motion. In our view the trial court correctly decided the issue.

*Ake* does not require the appointment of a psychiatrist of the defendant's choice. The United States Supreme Court was careful *not* to prescribe the method for the selection of the independent psychiatrist. It wrote as follows on that point:

> *This is not to say of course, that the indigent defendant has a right to choose a psychiatrist of his personal liking* or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel *we leave to the State the decision on how to implement this right.*

470 U.S. at 83 (emphasis added). *See Tuggle* v. *Commonwealth*, 230 Va. 99, 107, 334 S.E.2d 838, 843 (1985), *cert. denied*, 478 U.S. ____, 106 S.Ct. 3309 (1986); *Pruett* v. *Commonwealth*, 232 Va. 266, 351 S.E.2d 1 (1986). We hold that the trial court did not err in refusing to appoint a second independent psychiatrist.

### 2. *Admission of Evidence of Juvenile Offenses and Unadjudicated Criminal Activity*

Defendant complains further that the trial court erred, in the penalty phase, in admitting evidence relating to juvenile offenses and unadjudicated criminal activity. Defendant suggests that the evidence was not reliable and thus should not have been considered in deciding whether defendant presents a future danger to society. In broad outline, the evidence to which defendant objected included eight charges pending against him in Maryland, which stemmed from a single incident on April 7, 1985, in which

defendant allegedly struck his stepfather with a crowbar, chased him with a knife, and demanded money. In addition, as part of the same incident, the defendant allegedly stole $4,000 from a restaurant belonging to his stepfather's family. Further, there was evidence of defendant's juvenile record in Georgia from March 1979 to April 1982 which listed four separate charges of theft and commitment to Georgia juvenile institutions on three occasions. Finally, there was evidence that defendant attempted to escape from the Petersburg jail where he was held prior to his conviction in the present case.

In our opinion, the trial court properly admitted the evidence challenged by defendant. The reason for this is simple and straightforward: a trier of fact called upon to decide whether or not to impose the death sentence is entitled to know as much relevant information about the defendant as possible. We have repeatedly and consistently adhered to this view. *See, e.g., Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *LeVasseur* v. *Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063 (1984); *Poyner* v. *Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 865, 474 U.S. 888, 474 U.S. ____, 106 S.Ct. 208 (1985); *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Frye* v. *Commonwealth*, 231 Va. 370, 345 S.E.2d 267 (1986); *Pruett* v. *Commonwealth*, 232 Va. 266, 351 S.E.2d 1 (1986).

In *Peterson*, we said, with regard to penalty phase evidence, that in light of the statutory language "it is clear that more than the mere police record of the defendant may be introduced. Evidence is made admissible that would not be admissible in the guilt trial." 225 Va. at 298, 302 S.E.2d at 526. We said further that "[t]he statute does not restrict the admissible evidence to the record of convictions." *Id.*

In *LeVasseur*, we quoted with approval from *Jurek* v. *Texas*, 428 U.S. 262, 276 (1976), concerning what evidence a sentencing jury in a capital murder case ought to consider: " 'What is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine.' " 225 Va. at 594, 304 S.E.2d at 660. In the penalty phase of *Frye*, we upheld the introduction into evidence of information

concerning defendant's purported escape plan. 231 Va. at 392, 345 S.E.2d at 286. Nothing in the instant appeal warrants a departure from the line of cases permitting the use of unadjudicated criminal activity in the sentencing phase of a capital murder case. Nor do we see any viable reason to exclude the evidence of juvenile offenses. In our opinion, both groups of evidence were relevant to the issue of future dangerousness.

### 3. *Sufficiency of The Evidence of Future Dangerousness*

■ Defendant next contends that there was insufficient evidence to prove beyond a reasonable doubt "that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.2. In order to dispose of this assignment of error, we must consider, in the light most favorable to the Commonwealth, the evidence adduced at trial as that evidence bears upon the defendant's future dangerousness.

Before reaching a decision on the appropriate penalty, the trial court considered not only the evidence developed during the penalty phase of the case but also a presentence report along with evidence taken at the time the presentence report was presented to the trial court. Upon consideration of all the evidence, the trial court found "beyond reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continu[ing] and serious threat to society." In a bench ruling, the trial court explained the bases for its conclusion. The court referred to defendant's "numerous felony convictions for crimes principally in the State of Maryland." Referring to defendant's juvenile record, the trial court noted "defendant's history for his preoccupation or propensity to arm himself with a weapon." The trial court pointed out that there was also evidence that defendant assaulted his stepfather in April 1985 and that he stole a car and a pistol just prior to "his fateful journey to Virginia." The trial court made reference to defendant's escape attempts. The trial judge dismissed certain threats directed towards him, characterizing those threats as "boastful jail bravado." The trial court found no evidence that defendant was under extreme mental or emotional distress at the time of the murder.

There is evidence to support all the factors relied upon by the trial court in concluding that the Commonwealth had established defendant's future dangerousness beyond a reasonable doubt. The

presentence report revealed ten convictions for breaking and entering, all involving theft and the destruction of property.

With regard to his juvenile record, there was ample evidence of defendant's propensity to acquire firearms. In March 1979, while defendant was a juvenile, he broke into a car and stole cigarettes, money, and a pistol. A few weeks later, defendant got angry with some trash collectors and responded by getting his father's rifle and pointing it at the men. A short time later, defendant broke into a neighbor's home and stole a pistol and the neighbor's car.

In late December 1979, defendant's mother discovered him behind the home shooting a shotgun and a 30.06 rifle. She confronted defendant and an argument ensued. The mother left home and defendant took a shotgun and $40 and ran away. He was found in a stolen car. In June 1980, following an incident in which defendant was punished by his father and stepmother because a match was found in the commode, defendant went into a neighbor's house, stole some guns, and hid the guns in defendant's backyard.

The evidence concerning defendant's assault on his stepfather was introduced through the stepfather's testimony. The incident occurred in 1985. Defendant's stepfather testified that as he entered a building owned by his parents, defendant struck him on the back of his head with a crowbar. Defendant, wielding a knife, then chased his stepfather around a table demanding money. The stepfather locked himself in a bathroom while defendant searched for money. According to the stepfather, defendant stole $4,000.

There was also testimony concerning defendant's conduct while in jail in Petersburg. One of defendant's fellow inmates, testified that defendant stated he should have shot the passenger "so that he couldn't testify against him and that he would not be sitting in the courtroom" had he done so. According to the inmate, defendant asked him to draw a diagram of the outside of the jail to be used in an escape attempt. Defendant also boasted to the inmate that he was going to have someone smuggle some hacksaw blades to him "through a pair of tennis shoes." The inmate also stated that defendant threatened to "get" either the judge or the prosecutor. Directing his remarks to the trial judge, the inmate testified that defendant said "that at anytime he got out of jail or escaped or whatever the case might be that he would kill you one way or the other."

The evidence also established that after defendant was convicted of the series of breakings and enterings in Maryland, his sentences were suspended provided he successfully complete a drug treatment program. Defendant entered the treatment program on December 4, 1984, and fled from it on March 5, 1985, shortly before the assault on his stepfather and the murder of Trooper Whitt.

A psychological evaluation was made of the defendant upon his entry into the treatment program. Several significant conclusions were reached. The report, dated December 18, 1984, stated as follows:

The client is generally outgoing, self-indulgent, quite impulsive, and immature. He has low frustration tolerance, becomes bored easily, and may occasionally behave in a reckless and irresponsible manner which causes problems for himself and others. He may have a long history of legal or social difficulties. *If confronted or frustrated, he may explode.*

. . . .

This is a highly consistent profile reflecting personality traits of long duration. *It is not likely to change much with time.*

. . . .

Treatment or rehabilitation programs tend not to be very successful for individuals with this profile type since they rarely seek treatment on their own and have little genuine motivation to alter their behavior. *If forced into treatment, they initially appear cooperative and may appear to "enjoy" and profit from the program, but after a while they become bored or are unable to gain favor through their participation, and drop out.*

(Emphasis added.)

Defendant called two psychiatrists to testify concerning future dangerousness. The Commonwealth called one. All testified both before and after the presentation of the presentence report.

At the penalty phase proceeding, prior to the presentation of the presence report, defendant called Dr. James Dimitris and asked his opinion concerning defendant's future dangerousness "*to commit homicide*," a proof not required by the statute. Dr. Dimitris said he could not answer that question to a reasonable degree of medical certainty. When asked his opinion of defendant's future criminal conduct Dr. Dimitris responded that "it is my impression that Mr. Beaver has not profited from his experience." Dr. Dimitris stated that he did not believe defendant's claim of amnesia concerning the events surrounding the murder nor did he believe defendant's contention that he had been "shooting up" pure heroin prior to the murder. Dr. Dimitris added that defendant made no statement of remorse. Dr. Dimitris testified further that defendant's response to treatment was very poor at best. Concerning future conduct, Dr. Dimitris said that "unless it would be a radical change, this attitude will lead him nowhere."

Dr. Dimitris testified again after reviewing the presence report as well as the psychological report from the Maryland drug treatment program. He said the psychological report was significant not only because of its content but also because of its timing. This was so because when the test was conducted defendant was not under any "anxiety about punishment or any retribution or anything." Dr. Dimitris pointed out that even under such "auspicious" circumstances "this man was tested and the testing showed that the motivation for treatment is extremely — is short-lasting at best." Dr. Dimitris noted that defendant had exploded exactly as predicted. He concluded his testimony as follows:

> So the issue of treatment is something which nowadays' knowledge, nowadays' ability of the mental health system to deliver, it would take an enormous commitment on the part of the defendant to make the difference, because the profile is here, so that even when it is a commitment, it is a superficiality, and there is no commitment.

Defendant also called Dr. P. J. Reddy, the psychiatrist appointed by the court to assist defendant. In the initial penalty phase proceeding, prior to the introduction of the presence report, Dr. Reddy gave testimony relevant to the defendant's future dangerousness. He said defendant was a man who "finished his life in a way before he was started." He described defendant as

rebellious to authority because of the discipline he received from his father. Dr. Reddy said "this man never really had the upbringing which would train him to respect authority, to love somebody and respect them and other people." He stated further that "I do agree that he is impulsive. I do agree that he has a long-standing behavior problem. It would contribute, you know, part of his judgment and dangerousness." Dr. Reddy also stated that alcohol and drugs would enhance defendant's future dangerousness.

Dr. Reddy testified again at the hearing at which the presentence report was introduced. He said that defendant needed long-term in-patient treatment involving extensive group and individual therapy and some family counseling. He added, "Short of that, I do not see that there would be a whole lot of change in a situation like this; he needs long-term care." Dr. Reddy said that such treatment programs have an overall success rate of approximately 50 percent. He stated further that though defendant showed "a certain amount of regret" it was not to the extent that Dr. Reddy would like to have seen. According to Dr. Reddy, with regard to remorse, defendant was "somewhat a little casual."

The Commonwealth called Dr. William M. Lee, a clinical psychologist from Central State Hospital. In the proceedings on July 9, 1985, Dr. Lee testified that based on an examination conducted on May 24, 1985, he concluded that defendant had no sign of neuro-emotional disorder or of a predisposition to neuro-emotional disorder. Dr. Lee did not believe that defendant did not remember the murder because defendant "showed little concern about the possibility that he could have done these things." Yet such anxiety or concern is common in people suffering from amnesia.

Dr. Lee testified again at the September 1985 hearing. This time, based on his review of the presentence report and other information such as the psychological evaluation from the Maryland drug treatment program, Dr. Lee concluded that "Mr. Beaver would have extreme difficulty learning from experience or profiting from experience due to an antisocial personality disorder." Dr. Lee said further that defendant's claim that he was "high" on drugs at the time of the murder was in his opinion "unreliable" and may have been "a way of excusing behavior." Dr. Lee added that given

the current state of the art in treatment and some of the chronic motivational problems that he presents, I would not

recommend treatment as likely to be effective. . . . [H]e has had more than ample opportunity to be exposed to psychologists drug-treatment programs and apparently has not been responsive to this type of method.

In addition to the foregoing evidence concerning defendant's prior criminal conduct and psychological condition, the trial court had before it the evidence of the circumstances surrounding the murder of Trooper Whitt. Defendant's explanation for shooting the trooper twice was that nobody was going to take him back to jail. Yet he could have escaped after the first shot because the first shot disabled the trooper. However, instead of fleeing, defendant raised his gun again, paused, aimed, and shot Trooper Whitt between the eyes. The timing, aiming, and placement of the second shot when the officer was disabled and his pistol was still in his holster are, in themselves, probative evidence on the issue of defendant's future dangerousness.

Upon consideration of the record, we have no difficulty concluding that there was sufficient evidence of defendant's future dangerousness. We hold, therefore, that the trial court did not err in basing the death sentence upon defendant's future dangerousness.

### D. *Statutory Review*

Defendant's remaining assignments of error relate to the factors this Court is required by statute to consider in all capital murder cases where death sentences have been imposed. We turn now to a consideration of whether the death sentence in this case was imposed under the influence of passion, prejudice, or other arbitrary factor.

### 1. *Passion, Prejudice, or Arbitrariness*

Defendant submits that passion and prejudice are established because Trooper Whitt was a state trooper, a longtime resident of the county, "who was obviously known to the trial judge," and because of the attention paid to the case by the press. Upon our review of the record, we find no evidence that the death penalty was imposed under the influence of passion, prejudice, or other arbitrary factor. Nowhere in the record does it appear that the trial judge was influenced by any local knowledge he may have possessed. To the contrary, the trial was carefully conducted.

The evidence was fully developed. There is not a scintilla of evidence of any inappropriate conduct or remarks by the trial judge. The fact that a capital murder case is well publicized does not prove that a sentence of death is improperly imposed.

## 2. *Excessiveness and Disproportionality*

■ Defendant argues that his sentence is excessive and disproportionate because the record in this appeal fails to disclose a prior criminal record as serious as those of other defendants who have been sentenced to death for capital murder. We disagree. As we have stated on more than one occasion, the issue of excessiveness and disproportionality turns on whether triers of fact "in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *See Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980); *Pruett* v. *Commonwealth*, 232 Va. 266, 351 S.E.2d 1 (1986).

From our review of all capital murder cases appealed to this Court involving murders of law enforcement officers, including two cases in which life sentences were imposed, we conclude that Beaver's death sentence is not excessive or disproportionate.

The instant case is similar to *Evans* v. *Commonwealth*, 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand after original death sentence vacated*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985). There, the defendant was sentenced to death for shooting and killing a deputy sheriff during an escape attempt. Evans was found to pose a future danger to society. He had a record of assaultive behavior, including an assault on a police officer. We described him as having "a criminal record extending back to his youth showing a consistent pattern of aggression, bellicosity, and violence." 222 Va. at 779, 284 S.E.2d at 823.

In the present appeal, the evidence establishes that Beaver was prone to violence and the use of weapons, that he did not respond to treatment for drug abuse, that he attempted to escape from jail, that he showed little remorse for his crime, that he boasted he would kill officials involved in his prosecution, and that he expressed regret that he had not killed the eye witness who testified against him. We are confident based on the cited cases and facts of the instant appeal that the capital murder of a police officer by a defendant with Beaver's background where the officer is shot

twice, once in the neck and once between the eyes, is the type of crime for which the death penalty is imposed in Virginia. We find, therefore, that Beaver's sentence of death was not excessive or disproportionate.

### E. *Ineffective Assistance of Trial Counsel*

■ Relying upon Code § 19.2-317.1, defendant, by separate appointed counsel, attempts to raise, on direct appeal, a claim of ineffective assistance of trial counsel. The statute under which he proceeds reads as follows:

> A claim of ineffective assistance of counsel may be raised on direct appeal if assigned as error and if *all matters relating to such issue* are *fully contained* within the record of the trial.

(Emphasis added.) In our opinion, the prerequisites for proceeding under this statute have not been met in this case. In this appeal, it is manifest that all matters relating to the issue of ineffective assistance of counsel are *not* contained within the record of the trial court.

The allegations of ineffectiveness are as follows:

1. That trial counsel failed adequately to investigate the case and to present mitigating evidence; and
2. That trial counsel failed adequately to assist and utilize defendant's court-appointed psychiatrist.

Defendant complains of errors of omission committed by his trial counsel. Yet the record contains no testimony from trial counsel concerning his alleged acts of omission. Were we to attempt to dispose of defendant's contentions on this record, we would be called upon to declare the work of an attorney to be ineffective without that attorney having any opportunity to explain his conduct. *See Correll* v. *Commonwealth*, 232 Va. 454, 352 S.E.2d 352 (1987) (this day decided).

The defendant argues, however, that though the record does not contain everything that relates to the question of ineffective assistance of counsel, it contains enough to establish that trial counsel failed to do things that obviously should have been done and for which there can be no acceptable explanation. However, the stat-

ute does not say that we can proceed where there is partial evidence of ineffectiveness. The statute presupposes a full record on the very issue that is the basis for the claim of ineffective assistance of counsel. We conclude, therefore, that defendant's claim of ineffective assistance of trial counsel cannot be raised in this appeal.

## V. CONCLUSION

For all the foregoing reasons, the judgments appealed from will be affirmed.

Record No. 850828 — *Affirmed.*
Record No. 850861 — *Affirmed.*