Present:  All the Justices

THOMAS LEE ROYAL, JR.

v.   Record No. 942223      OPINION BY JUSTICE ELIZABETH B. LACY
                                          June 9, 1995
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Nelson T. Overton, Judge


Thomas Lee Royal, Jr., was indicted for the capital murder of City of Hampton police officer Kenneth Earl Wallace and use of a firearm in the commission of the murder in violation of Code §§ 18.2-31 and -53.1, respectively.  Royal entered pleas of guilty on both charges and received sentences of death for the capital murder charge and three years' imprisonment for the firearm charge.  The trial court denied Royal's motion for reconsideration of the death sentence.

We consider Royal's appeal of the imposition of the death penalty with the automatic review of the death sentence to which he is entitled under Code § 17-110.1.

I.  The Guilt Phase

At a hearing held by the trial court on September 19, 1994, the Commonwealth presented the following facts as stipulated by the parties:

> On Monday, February 21st, 1994, Thomas Royal, Yancy M. Mitchener, Eldred Acklin, and Willie Sanders met in the vicinity of Chesapeake Court Apartments near Wythe Shopping Center.  Thomas Royal handed each of the other three a gun with the intention to kill Hampton police officer Curtis Cooper.  These four persons started to cross Wythe Shopping Center and they did not see Office[r] Cooper but did see Officer Kenneth E. Wallace of the Hampton Police Department.

> Thomas Royal pursued Officer Wallace, followed by Yancy M. Mitchener and Eldred Acklin.  Willie Cardell Sanders hung back.  Thomas Royal encountered

> Officer Wallace and fired two shots from a .380
> caliber handgun at Officer Wallace while Officer
> Wallace was seated in his police cruiser on
> Pocahontas Place in Hampton, Virginia. Thomas Royal
> fled. Officer Wallace died as a result of a wound
> inflicted by Thomas Royal.
>
> Yancy M. Mitchener and Eldred Acklin both fired
> at the marked police car hitting the car but not
> Officer Wallace. Both Mitchener and Acklin then fled
> following Thomas Royal. Royal, Mitchener, and Acklin
> rejoined Sanders back at the Chesapeake Court
> Apartments. All four eventually fled Hampton that
> night and spent it in a motel in Norfolk.

Royal also introduced a letter he had written to Officer Wallace's father expressing his sorrow for the murder and asking for the family's forgiveness. The trial court accepted Royal's guilty pleas after finding that the pleas were made freely and voluntarily following full consultation with counsel.

## II. The Penalty Phase

On October 19, 1994, the trial court conducted a hearing encompassing the proceedings required by Code §§ 19.2-264.4 and -264.5. In addition to the testimony of the probation officer who prepared the pre-sentence report, the Commonwealth's evidence consisted of the testimony of Dr. Miller M. Ryans, a forensic psychiatrist who evaluated Royal; Detective Corporal Edgar A. Browning of the Hampton Police Department who, while investigating the murder of Officer Wallace, took a statement from Royal regarding the murder; Officer Curtis C. Cooper of the Hampton Police Department, Royal's intended victim; and Dr. Greg Wolber, a psychologist and rebuttal witness. Royal

- 2 -

introduced the testimony of his wife, Pamela, and Dr. Andrew J. Billups, III, a psychologist.

The Commonwealth's evidence showed that Royal's prior criminal record began in 1983 as a juvenile and included involvement with numerous offenses against property. As an adult, he was convicted of destroying property, petit larceny, assault and battery, interfering with a police officer, trespass, and possession of cocaine. In August 1994, shortly before his conviction for the murder of Officer Wallace, Royal was convicted of second degree murder and use of a firearm in the commission of the 1991 murder of James Smith.

Dr. Ryans testified that Royal displayed six of the seven diagnostic criteria connected with an antisocial personality disorder. For example, Royal did not "conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest," exhibited "reckless disregard for safety of self or others," and displayed "lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another." Dr. Ryans testified that there is no treatment for this condition and that, in Royal's case, this pattern of behavior was "gradually escalating." As to his future dangerousness, Dr. Ryans stated that "I cannot say with reasonable medical certainty that under certain circumstances there would not be a repetition of violent behavior by this

individual that would put others at risk."

Royal's expert, Dr. Billups, testified that school personnel had concluded that Royal was mentally retarded based on intelligence evaluations administered in 1982 and 1986. Dr. Billups concluded, based on his own testing, that Royal functioned "in the borderline range of intelligence." Dr. Billups agreed that Royal had an antisocial personality disorder and surmised that the conditions of his childhood, including encouragement from family members to engage in criminal acts, would have contributed to such a disorder. This disorder, Dr. Billups testified, "has a chronic course that may become less evident or remit as the individual grows older, particularly by the fourth decade of life." Finally, Dr. Billups testified that Royal had expressed genuine remorse and had the potential to be rehabilitated.

At the close of the evidence, the trial court granted Royal's motion to strike the Commonwealth's evidence relating to the statutory predicate of vileness but not as to the future dangerousness predicate. The trial court, after "taking into consideration all the evidence in the case, the report of the Probation Officer, the matters brought out on cross examination of the Probation Officer, and such additional facts as were presented by the accused," held that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The trial

court fixed Royal's sentence at death. After offering Royal the opportunity to present any evidence or reason why the death penalty should not be imposed, the trial court entered judgment imposing the death penalty.

Royal assigns error to a number of the trial court's actions during the sentencing phase of the proceedings. These involve the type of evidence which the trial court could consider in determining the statutory predicate of future dangerousness, the sufficiency of the evidence to establish future dangerousness, the failure of the trial court to impose life imprisonment as an alternative to the death penalty, and the trial court's denial of Royal's motion for reconsideration of the imposition of the death penalty. We consider Royal's assignments of error in order.

### a. Admissibility of Evidence

At the beginning of the sentencing hearing, the Commonwealth stated that it was not proceeding on the statutory predicate of vileness, only on future dangerousness. Royal asserts that, when future dangerousness is the sole statutory predicate relied on by the Commonwealth, Code § 19.2-264.2 limits the relevant evidence solely to consideration of the defendant's record of past criminal convictions. Therefore, Royal contends, the trial court erred in considering circumstances surrounding the murder of Officer Wallace in making a determination as to Royal's future dangerousness. In

addition, Royal asserts that by allowing circumstances of the crime to be considered in determining future dangerousness, the offense becomes the sole basis for determining the sentence and thus, in this case, the death penalty is the "ipso facto result of the murder of a police officer." This result, Royal argues, violates the principle of individualized sentencing required in death penalty cases. Woodson v. North Carolina, 428 U.S. 280, 303-04 (1976). We disagree.

The statutory provisions governing the imposition of the death penalty do not limit consideration of whether a defendant will be a future danger to the defendant's prior criminal record. Both subsections B and C of Code § 19.2-264.4 specifically provide that evidence of the circumstances of the offense may be considered.[1] Neither restricts this evidence to proceedings based on the vileness predicate. We have previously rejected the restrictive construction of the

---

[1]Code § 19.2-264.4 provides, in pertinent part:
    B.  Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense.

        . . . .

    C.  The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society.

relevant statutes advanced by Royal and find no reason to depart from that position here.  Frye v. Commonwealth, 231 Va. 370, 392, 345 S.E.2d 267, 283 (1986).

Furthermore, the statutory scheme comports with the constitutional requirement of individualized sentencing.  Where the sentencing body is required to find a statutorily prescribed aggravating factor to qualify a defendant for consideration of the death penalty, "[t]he aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."  Tuilaepa v. California, ___ U.S. ___, 114 S.Ct. 2630, 2635 (1994).  Therefore, the circumstances of the crime appropriately may be considered when determining whether the statutory predicate of future dangerousness exists.  The individualized sentencing required by the Constitution is further satisfied when, having established the statutory predicate, the sentencing body then proceeds to consider whether the death penalty should be imposed in each specific case.  See Zant v. Stephens, 462 U.S. 862, 879 (1983).

Royal also contends that the trial court erred in not limiting the evidence relating to the murder of Officer Wallace to that stipulated by the parties in the guilt phase of the trial.  Specifically, Royal objects to the admission of Detective Browning's testimony and a videotape in which Royal told Browning that he planned to kill Officer Cooper to avoid

threatened harm to his family, a story Royal later admitted was false.

A function of stipulations is to identify factual matters which are not in dispute. The stipulations recited factual events which occurred when Wallace was murdered. They did not include an agreement precluding either Royal or the Commonwealth from offering other particulars of the crime for the factfinder's consideration. Therefore, neither the Commonwealth nor the trial court was under any obligation to limit evidence of the crime to the stipulated facts.

Accordingly, the trial court did not err in considering relevant evidence in addition to Royal's prior criminal record and the factual stipulations in determining whether Royal would be a future danger to society.

### b. Sufficiency of the Evidence

Royal next argues that the trial court erred in determining that he would be a future danger to society because the Commonwealth failed to establish a prima facie case of future dangerousness and, therefore, his motions to strike the Commonwealth's evidence should have been granted.

In determining whether the trial court erred in denying Royal's motion to strike the Commonwealth's evidence of future dangerousness, we consider the evidence in the light most favorable to the Commonwealth. It is undisputed that Royal planned the murder of Officer Cooper and furnished each of the

three co-conspirators with the weapons for the crime. Moreover, when Royal realized the officer in the car was not his original intended victim, Officer Cooper, he did not abandon his plan. He proceeded to murder Officer Wallace, not because of any acrimony toward Officer Wallace, but apparently because Officer Wallace was there and Officer Cooper was not. Dr. Billups, Royal's expert witness described Royal's mental capacity as borderline, which he explained as "not high enough to be considered normal, but yet not low enough to be considered retarded." Nevertheless, the evidence shows that Royal had the capacity to, and did, plan a serious criminal offense, recruit others to participate, and execute the plan. More importantly, killing a person under these circumstances shows clear disregard for human life. This evidence, combined with the "escalating nature" of Royal's antisocial personality disorder, is sufficient to support a finding that Royal would be a future danger to society.

Royal asserts, however, that comments made by the trial court while ruling on Royal's motion to strike the Commonwealth's evidence show that the trial court erroneously shifted the burden to him to disprove that he was a future danger. Those comments, however, must be considered in context.

Royal based his motion to strike, in part, on Dr. Ryans' statement that he could not state with medical certainty that

under certain circumstances Royal would not repeat violent behavior that would put others at risk. Royal characterized this testimony as "equivocal." In response, the Commonwealth argued that the issue of future dangerousness was not for Dr. Ryans or any other qualified medical person to decide, but for the trier of fact to resolve based on the medical evidence as well as all other relevant evidence. In denying the motion to strike, the trial court commented that,

> [i]n fairness or in passing, if Dr. Ryans or anyone else had sat there and said as a matter of psychiatry or psychology we were able to say to a reasonable degree of medical certainty that Mr. Royal wouldn't do this again, I would have listened to them.

Taken in context, the court's comment does not establish a requirement of affirmative expert testimony that Royal was or would not be a future danger to society as a prerequisite to such a finding by the court. Rather, this comment was directed at the evidentiary weight the trial court would give to Dr. Ryans' testimony. Nothing in the trial court's statement placed the burden of proof on Royal to affirmatively show that he would not be a future danger to society.

Finally, Royal argues that the finding of future dangerousness was flawed because the Commonwealth was bound by the expert testimony of Dr. Ryans, which did not establish future dangerousness, and because Royal's prior conviction for second degree murder was on appeal and therefore should not have been considered as evidence of future dangerousness. We

- 10 -

disagree. Dr. Ryans' testimony was not an affirmative opinion that Royal either would or would not be a future danger to society. This statement did not preclude the Commonwealth from proving future dangerousness by other evidence. Furthermore, the trial court was entitled to consider Royal's prior murder conviction even though that conviction was on appeal at the time of sentencing. Peterson v. Commonwealth, 225 Va. 289, 297-98, 302 S.E.2d 520, 525-26, cert. denied, 464 U.S. 865 (1983). Accordingly, the trial court did not err in denying Royal's motion to strike.

### c. Imposition of the Death Penalty

Royal argues that the trial court erred in not considering life imprisonment as a viable sentencing alternative. Dr. Billups testified that Royal had potential for rehabilitation and that his antisocial personality disorder might subside or go into remission by his fourth decade of life. On this basis, Royal asserts that lengthy incarceration is appropriate. The record shows, however, that the trial court did consider Dr. Billups' testimony, but concluded that, based on the evidence, rehabilitation would not occur and that Royal's criminal record was one of increasing violence. In sum, the trial court appropriately considered all the evidence and decided against the position advanced by Royal.

### d. Recusal

Royal assigns error to the trial court's failure to grant

his motion for reconsideration in which he asserted that the trial judge should vacate the sentence of death, recuse himself, and ask that a new judge be appointed to impose sentence.  This action was necessary, Royal argues, because of the substantial publicity surrounding the case and, specifically, the public pressure directed toward the judge to impose the death penalty.

We find no merit in this assignment of error.  Public notoriety of a trial does not prove that a sentence is improperly imposed.  Beaver v. Commonwealth, 232 Va. 521, 536, 352 S.E.2d 342, 350, cert. denied, 483 U.S. 1033 (1987).  The record is devoid of any indication that the trial court's sentencing decision was affected by public pressure or publicity.  The trial judge did not abuse his discretion in refusing to recuse himself on this basis and did not err in denying Royal's motion for reconsideration.

### III.  Statutory Review

Pursuant to Code § 17-110.1(C), we must review Royal's death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Royal argues that the death penalty was imposed under the influence of passion and was arbitrary and disproportionate

because the trial court stated that the "mitigating factors are not sufficient, in the view of the Court, to make any substantial difference in this situation." This statement, Royal asserts, shows that the trial court "must have overlooked" the mitigating factors, including Royal's guilty pleas, his remorse for the crime, as shown in the letter to Officer Wallace's father, his fatherless home life surrounded by relatives involved in criminal activities, his attempts at work and marriage, and his mental retardation. Thus, Royal concludes, the sentence imposed was arbitrary. We disagree.

The trial court reviewed the aggravating and mitigating evidence, finding that it showed "a life or a record of increasing violence." The trial court noted that the mitigating circumstances might engender "a distinct degree of sympathy for Mr. Royal for some of the things which [have] brought him to the place where he is." In the trial court's view, however, those circumstances did not change the pattern of escalating violence which had risen to the level of capital murder of a police officer. There is no indication that the trial court's sentencing decision was influenced by passion, prejudice, or any other arbitrary factor.

Finally, the death penalty was neither excessive nor disproportionate in this case. We have reviewed cases involving the capital murder of a police officer in which the penalty imposed was life imprisonment or death based solely on

a finding of future dangerousness.  Based on that review, we conclude that sentencing bodies in Virginia generally have imposed the death penalty in circumstances substantially similar to those presented in this case.  See, e.g., Delong v. Commonwealth, 234 Va. 357, 362 S.E.2d 669 (1987), cert. denied, 485 U.S. 929 (1988); Beaver, 232 Va. at 524, 352 S.E.2d at 344; Evans v. Commonwealth, 228 Va. 468, 323 S.E.2d 144 (1984), cert. denied, 471 U.S. 1025 (1985).  Accordingly, we hold that the death penalty imposed here is neither excessive nor disproportionate.

In conclusion, we find no reversible error among the issues presented by Royal's appeal.  Having conducted the review mandated by Code § 17-110.1, we decline to commute the sentence of death.  Accordingly, we will affirm the judgment of the trial court.

Affirmed.